**COUNTY OF JOSEPHINE, et al., Plaintiffs,**

v.

**James G. WATT, Secretary of the Interior, et al., Defendants.**

**No. C–81–3262–WAI.**

United States District Court, N. D. California.

May 28, 1982.

---

William F. Martson, Jr., Bruce G. Berning, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., Andrew J. Ogilvie, Collette & Erickson, San Francisco, Cal., for plaintiffs.

M. Anne Jennings, Deputy Atty. Gen., Charles M. O'Connor, Asst. U. S. Atty., San Francisco, Cal., Carol E. Dinkins, Asst. Atty. Gen., Anthony C. Liotta, Deputy Asst. Atty. Gen., William M. Cohen, Janice Siegel, Jacques B. Gelin, Attys. Dept. of Justice, Land and Natural Resources Div., Washington, D. C., for defendants.

## DECISION

INGRAM, District Judge.

The motions before the Court are cross-motions for summary judgment and additional alternative motions of plaintiffs for specification of issues without substantial conflict under the provisions of Fed.R.Civ.P. 56(d) and for preliminary injunction.

## PARTIES

The parties plaintiff are four southern Oregon counties: Josephine, Douglas, Klamath and Curry; Grants Pass and Josephine County Chamber of Commerce, a non-profit corporation; North West Timber Association, a non-profit association; Southern Oregon Resources Alliance, a non-profit corporation; Rough & Ready Lumber Company, a corporation; Spaulding & Son, Inc., a corporation; and Elizabeth Van Gordon, an individual citizen of Oregon.

The parties defendant are James Watt, Secretary of the Interior of the United States; the United States Department of the Interior; Heritage Conservation and Recreation Service, an agency and element of the Department of the Interior; John R. Block, Secretary of Agriculture of the United States; the United States Department of Agriculture; and the United States Forest Service.

The State of California, the Environmental Defense Fund, Sierra Club, California Trout, and Save the American River Association have intervened, and have filed briefs in support of the position of the federal defendants.

## THE COMPLAINT

In its charging allegations the complaint on file herein in substance alleges:

1. As a first claim that defendants failed to comply with the provisions of 42 U.S.C. § 4332, and with those of

40 C.F.R. §§ 1500.1 *et seq.*, because they failed to invite state, county and local agencies in Oregon to participate in the scoping process because no invitation to participate was extended to such agencies and no hearings were conducted in Oregon.

2. As a second claim that defendants failed to send copies of the DEIS or to request comments thereon from plaintiff counties, other plaintiffs herein, or any state or local agencies in Oregon or to hold hearings in Oregon, all in violation of 40 C.F.R. §§ 1503.1(a)(2), 1506.6(a), 1506.6 and 1506.6(c)(1).

3. As a third claim that neither the DEIS or the EIS adequately analyze the impact of the proposed designation upon the ecology, environment, economy, culture and social fabric of southern Oregon and therefore fail of compliance with NEPA and CEQ regulations.

4. As a fourth claim that the proceedings leading to the EIS and ultimately to the secretarial decision were not conducted with good faith objectivity, and that Oregon interests were knowingly excluded from those proceedings.

By way of relief plaintiffs pray:

1. A declaration that the secretarial action was unlawful and a judgment setting the action aside.

2. A temporary, preliminary and permanent injunction enjoining defendants from implementing the secretarial action, including the breaching modification or cancellation of existing timber sale contracts, postponing the processing of timber sales, refusing to offer for sale timber which would be offered but for the designation, reducing the volume of timber to be sold, promulgating regulations, pursuant to the designation, entering into land management agreements with California, giving effect to the designation in any forest planning project, or in any other fashion implementing the designation.

3. A temporary, preliminary and permanent injunction enjoining defendants from executing the requested designation until plaintiffs, the State of Oregon and other interested counties of Oregon, are included in the evaluation process required under 42 U.S.C. § 4321.

## DECISION

Plaintiffs' Motion for Summary Judgment and Application for Preliminary Injunction are denied. Defendants' Motion for Summary Judgment is granted as to the first, second, and fourth claims of the complaint, and denied as to the third claim.

## FACTS

The complaint alleges that by letter dated July 18, 1980, the governor of California, Honorable Edmund G. Brown, Jr., requested the then Secretary of the Interior, Honorable Cecil D. Andrus, to designate certain California rivers, together with their tributaries, as included in the National Wild and Scenic Rivers System established by the act codified in 16 U.S.C. §§ 1271 *et seq.*

Because such a designation constitutes a "major federal action" within the meaning of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, the involved federal agencies were required to prepare an Environmental Impact Statement (EIS), and defendant Heritage Conservation and Recreation Service (HCRS) undertook to do that. Accordingly, on August 7, 1980, HCRS published in the *Federal Register* a Notice of Intent to prepare an EIS. The time for receipt of comments on the scope of the EIS was set to conclude on August 20, 1980. During the intervening time "scoping" meetings were held in San Francisco, Los Angeles, Fresno and Eureka, California.

On or after August 20, 1980, HCRS through its director, and the Secretary of the California Water Resources Agency entered into a "Cooperative Work Agreement" providing for cooperative work, including the setting of time limits appropriate to permit the rendering of a secretarial decision on the proposed designation by early January, 1981.

The Draft Environmental Impact Statement (DEIS) was filed on September 16, 1980, and notice of its availability was published on September 23, 1980.

Thereafter, HCRS requested comment on the DEIS from twenty-eight federal departments and bureaus, four federal installations located in California, seventeen separate government agencies of the State of California, and officials of six California counties. Public hearings on the DEIS were held in Redding, Eureka, Crescent City, Sacramento and Los Angeles, California.

The DEIS was filed with the Environmental Protection Agency (EPA) on September 16, 1980, and the period for comment upon it expired on December 1, 1980.

HCRS forwarded the EIS for filing on December 12, 1980, and copies were transmitted to commenting agencies and made available to the public during the week of December 15, 1980. Publication in the *Federal Register* was on December 17, 1980.

Actions were filed seeking to enjoin designation of the five rivers as part of the National System in the District of Oregon and in the Northern District of California. A Temporary Restraining Order was issued in the former case and a Preliminary Injunction in the latter. Both orders were dissolved by the United States Court of Appeals for the Ninth Circuit on January 19, 1981, on the basis of lack of jurisdiction because of no final agency action.

On January 19, 1981, then Secretary Andrus signed his secretarial decision designating the rivers in question as part of the National System of Wild and Scenic Rivers.

## PLAINTIFFS' CONTENTIONS

Plaintiffs seek summary judgment on each of the following grounds:

1. There is no triable issue of fact that neither the State of Oregon nor any Oregon entity, agency or person was invited to participate in the meetings conducted with respect to the proposed scope of the environmental impact inquiry. The failure to invite governmental institutions, agencies and other appropriate entities violates 40 C.F.R. § 1501.7(a)(1).

2. There is no triable issue of fact concerning the inadequacy of the DEIS and of the EIS, or that those instruments are invalid as a matter of law because they failed to address a significant environmental impact in Oregon, and/or failed to explain why such impact was insignificant.

3. As a matter of law under 40 C.F.R. § 1503.1(a)(2) the agency of the United States charged with the environmental impact inquiry and with preparation of the statements resulting therefrom was required to solicit comments from affected state and local agencies in Oregon, and there is no triable issue of fact but that it did not do so.

4. As a matter of law that agency abused its discretion by not holding hearings in Oregon.

5. That agency in preparing the EIS did not conduct its inquiry objectively, did not allow enough time to do so, and was guided by "practical political considerations."

Factual reliance is placed by plaintiffs on a number of affidavits, which are identified and briefly summarized as follows:

1. LEWIS N. KRAUSS—President, Rough & Ready Lumber Company. Krauss says his company, Rough & Ready, manufactures fir and pine logs into lumber, and that it obtained in 1980, more than one-half of its log supply from northern California. He says that his company competed for that log supply with two lumber companies in California and with one in southern Oregon. He says that he also competed with the same two California companies for Oregon Timber, which comprised most of the rest of his supply. He says that if hearings were or will be held in Oregon, he would have and will testify, because he says that the inclusion of the Smith River in the National Wild and Scenic River System would directly affect the ability of his company to get needed logs. He says that his company was never contacted or invited to testify at hearings on the DEIS.

2. KAY WILCOX—A–95 coordinator for Oregon State Clearinghouse. Wilcox says that A–95 is used by the federal government as an Oregon contact for environmental matters. Draft Environmental Impact Statements are sent to A–95, and A–95 is notified when Oregon's participation is requested in the process to determine the scope of environmental impact from a proposed major federal action. She says she has reviewed records of A–95 and finds no record of contact with respect to the matter at hand, and no record of receipt of either the DEIS or the EIS.

3. JOHN T. McMAHAN—Manager of Grants Pass and Josephine County Chamber of Commerce. He says that many Chamber members are in the lumber and plywood business and get materials from the part of northern California which is affected by inclusion in the National Wild and Scenic River System.

He says that the inclusion in the system of the five northern California rivers will reduce the supply of logs in northern California and will increase competition for logs sold in southern Oregon, which will increase the demand to cut private timber, which would otherwise not have been cut.

3. FLOYD L. WYNNE—Commissioner of Klamath County, Oregon. He says Klamath County was not invited to participate in the proceedings leading to the DEIS and did not receive a copy of the draft. He says that had Klamath County been invited, it would have participated, and would have sent a representative to any hearing conducted in Oregon. He says that lumber and plywood is a major industry in Klamath County and that it will be adversely affected by inclusion of the northern California rivers in the National Wild and Scenic Rivers System. He says that inclusion will result in decrease of employment in Klamath County by reason of closure or limitations on production of mills, owing to decrease in log supply. This in turn will result in decreased revenues to the county, and decrease the quality of life.

5. NELL KUONEN—Klamath County Commissioner and Chairman of the Board of Commissioners. Identical affidavit to that of Wynne.

6. ALVIN CHEYNE—Commissioner of Klamath County. Identical affidavit to that of Wynne.

7. DAVID R. COX—Cox is an experienced forest consultant. His affidavits consider four subject matter areas with respect to the coverage of the FEIS as it relates to timber harvest availability and kindred subjects: (1) relationship and interdependence of southern Oregon and northern California timber economics; (2) review of analysis of timber supply problems in southern Oregon, both present and future, as analyzed in the EIS; (3) treatment accorded future impacts on forest economy resulting from alternative Wild and Scenic River designations in the EIS; and (4) analysis of results which designation might have on private forest land adjacent to designated rivers.

Cox concludes:

A. The EIS does not discuss potential impact which the requested designation might have on overall forest economy and forest environment in southern Oregon, nor does it adequately analyze future economic impact because it speaks in terms of "potential programmed harvest" rather than "potential yield" of timber.

B. The EIS fails to discuss potential harvest limitation on private and state land which might result from the designation.

C. There is no adequate treatment in the EIS of the competition for timber supplies which exists between similar manufacturers in southern Oregon and northern California, and the consequent effect on Oregon manufacturers of the reduction of timber supplies occasioned by the designation. Several tabular computations are rendered by Cox in support of his conclusion.

D. The EIS does not adequately address the increased competitive pressures for timber supplies which will result from the designation.

E. The EIS fails to distinguish between varying corridor widths and other management modalities as between rivers; alterna-

tives for more narrow buffers are not examined.

F. Potential harvest reductions on the Klamath and Trinity Rivers are not examined by the EIS.

G. The EIS fails to evaluate alternative impacts on private lands.

8. ELIZABETH VAN GORDON—Van Gordon avers that she is an individual residing in Grants Pass, Oregon, and using and anticipating future use of county and state forest lands in southern Oregon for recreational purposes.

She further avers that increased timber harvest on those county and state Oregon lands will diminish her ability to continue her recreational experience on those lands and will affect the recreational opportunities of others similarly situated.

Various supplementary affidavits have also been filed.

### DEFENDANTS' CONTENTIONS

The federal defendants, in support of their own Motion for Summary Judgment and in opposition to the like motion of plaintiffs, contend:

1. Plaintiffs lack standing.

2. All legal requirements inherent in the NEPA process have been fulfilled.

3. The EIS adequately addresses appropriate impact and alternatives.

4. The focal point for judicial consideration should be the administrative record.

5. The administrative record discloses that the public, including plaintiffs, were invited to participate in the scoping and comment procedures. Moreover, several plaintiffs, including Curry and Josephine Counties, participated in the scoping process.

6. Availability of the DEIS for distribution was announced to the public in three press releases and three publications in the *Federal Register.*

7. Three out of the ten scoping hearings were conducted in northern California, convenient for Oregon residents.

8. The matters now urged by plaintiffs were never raised during the NEPA process and they should have been.

9. Both the DEIS and EIS gave adequate consideration to impacts occurring in Oregon as the result of the designation.

10. The McKillop Report was commissioned by HCRS and specifically comments on possible effects of the designation in Oregon.

11. An analysis of the administrative record amply demonstrates the good faith with which the federal defendants acted.

12. Plaintiffs have not demonstrated standing, because some have failed to state an injury; some, though stating an injury, have failed to allege a causal connection between the injury and the proposed action; some have claimed only an economic as contrasted with an environmental hardship. Economic injury is not within the zone of interest protected by NEPA.

### STANDING

The issues are considered as follows:

Defendants contend that none of the plaintiffs have the necessary standing to maintain this action because they do not comply with the requirements necessary in the application of both constitutional and prudential requirements. The general requirements have recently been reiterated by the Ninth Circuit in *Stratman v. Watt,* 656 F.2d 1321 (9th Cir. 1981):

a. A particularized injury.

b. Concretely and demonstrably resulting from defendants' action.

c. Which injury will be regressed by the remedy sought.

Earlier, the Ninth Circuit in *Port Astoria, Oregon, v. Hodel,* 595 F.2d 467 (9th Cir. 1979), indicated these requirements as applied to NEPA cases to include the elements of the allegation of an "injury in fact" which injury is "arguably within the zone of interest to be protected or regulated" by the statute that plaintiff claims the agency violated.

In this case it is convenient to divide the plaintiffs into three groups, as follows: (1) individual citizens recreational users—this group would include plaintiffs Elizabeth Van Gordon and SORA; (2) governmental agencies—this group includes the plaintiff counties; (3) the lumber interests—this group includes plaintiffs Rough & Ready Lumber Company; Spaulding Lumber Company; the Chamber of Commerce insofar as it is constituted by lumber company members; the Timber Association and SORA insofar as they are constituted by lumber company members.

Defendants have alleged that neither plaintiffs Van Gordon nor SORA have alleged any injury in fact at all. This contention is based upon a failure of these plaintiffs to allege the specific manner in which they use recreational resources and how they will be specifically affected by the Wild and Scenic River designation in question. In making this assertion, defendants rely upon *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Defendants contend that Van Gordon in her two affidavits only alleges the use of unspecified lands for unspecified purposes. Plaintiff SORA says defendants only allege membership concern with management of resources.

Defendants contend with respect to the plaintiff counties that they have alleged only the increased pressure to cut locally grown timber as the result of the designation in issue and that such designation will have an unspecified effect on the counties' environmental zoning responsibilities as set forth in Oregon Revised Statutes §§ 215.050 and 215.110. Defendants contend that these assertions on the part of the counties do not constitute a statement of injury because the specific nature of the anticipated effect is not stated.

The defendants attack the standing of the lumber interests both on the ground of lack of injury in fact and upon the additional ground that the interests asserted by these plaintiffs are solely economic and therefore do not fall within the zone of interest protected by NEPA.

I find that all plaintiffs have adequately alleged and otherwise demonstrated by the affidavits on file herein that they and each of them have standing to maintain this action. It is not necessary in my view that the requirement of the demonstration of "particularized injury" be accomplished with the degree of specificity contended for by defendants. Plaintiffs correctly allege that they are "adversely affected" or "aggrieved" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702, because each of the plaintiffs allege a direct interest in the matter in controversy and have alleged more than the value of interests of concerned bystanders which distinguishes them and each of them from the situation of plaintiffs in *Sierra Club, supra.* Each of plaintiffs have alleged a direct use in a recreational or occupational sense of the areas and places upon which the impact of the proposed action of designation may be reasonably said to fall. Each of plaintiffs have sufficiently alleged adverse affect in the area in which they live; each alleges perceptible harm by the challenged action. In at least one respect as will hereinafter appear, such injuries may be true and may be capable of proof at trial as required by the criteria considered in *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). I conclude that injury in fact has been adequately alleged.

As indicated previously, plaintiffs must show that the injuries of which they complain fall within the zone of interest protected by the statute and procedures which they seek to attack. *Assn. of Data Processing v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Mere economic concern has generally not been recognized as sufficiently within the zone of interest attributable to NEPA to confer standing. *Port of Astoria, Oregon v. Hodel, supra.* In support of their claim of standing, these plaintiffs rely so primarily upon *Port of Astoria, supra.* In that case, standing was affirmed in a business entity, a broadcasting company whose injury was primarily economic. Its injuries were said to be causally related to an act lying within the proper ambit of

NEPA. · In that case the injury was found to causally stem from the construction of a power plant which was the subject of NEPA investigation. In this same case standing was denied to the Port of Astoria, a municipal corporation, because its alleged injuries, namely, loss of tax base revenue, out-of-pocket expenses, and a financial guarantee for the purchase of a new dock were said to be outside NEPA's zone of interest because not so causally related. In the case of the municipality, the injurious action claimed was the removal of the proposed power plant to a different site, a happening which would have no direct environmental impact at all. In the instant case, the lumber plaintiffs contend a direct causal impact from the Wild and Scenic designation upon the amount of lumber subject to harvest in northern California, the diminution of the lumber supply thereby with resultant economic and environmental impact. It is my view that under *Port of Astoria, supra,* and *National Helium Corporation v. Morton,* 455 F.2d 650 (10th Cir. 1971), zone of interest standing is adequately alleged inasmuch as the lumber plaintiffs are causally affected by a matter of NEPA concern and seek to protect not only their individual financial interests, but also the quality of life and public interest of their geographic region. Accordingly, I conclude that all plaintiffs have the necessary standing.

## PROCEDURAL ADEQUACY OF PROCEDURES LEADING TO ENVIRONMENTAL IMPACT STATEMENT

The crux of plaintiffs' allegations in this case relate to the asserted inadequacies of the EIS by reason of its failure to adequately consider the impact of the proposed federal action upon the areas and residents in southern Oregon. In connection with these allegations, plaintiffs aver that the lead agency did not properly comply with the regulations promulgated by the Council on Environmental Quality (CEQ), which prescribe the manner in which federal agencies must conduct the investigative procedures leading to the preparation of an EIS.

Plaintiffs initially contend that the entire procedure in this instance is tainted by the desire of the administration of the State of California and of the HCRS to speed the investigative process in the interest of having the question of designation considered by the Honorable Cecil D. Andrus, then Secretary of the Interior of the United States. In support of their contention in this regard, plaintiffs have directed the Court's attention to a memorandum prepared by Brian O'Neill, an Assistant Regulatory Director of HCRS which is marked Ex. E to plaintiffs' memorandum in support of its motion for summary judgment or preliminary injunction, and which contains language arguably consistent with the contention just defined.

Plaintiffs refer also to the wording employed by Secretary Andrus in a letter to Governor Brown, advising the latter of the secretarial execution of the designation. Plaintiffs suggest that the adoption of the minimum possible time periods for a complex matter such as the proposed designation is consistent with a lack of good faith objectivity.

■ Matters of motivation in a review such as this may not be of primary importance. In *Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir. 1973), it is said that in evaluating adequate compliance with § 102 of NEPA the test is good faith objectivity rather than subjective impartiality. Thus, the desire of California authorities and perhaps of others to present the request for designation to and obtain action thereon by a favored decision maker will not indicate a lack of compliance with NEPA providing that it is fairly inferable that the resulting EIS was prepared and tendered with good faith objectivity.

The main thrust of plaintiffs' contentions with respect to non-compliance with the appropriate CEQ regulations is that the administrative record does not disclose specific invitation to state and local agencies resident in the state of Oregon to participate in any of the scoping sessions or to provide comment of any kind. Nor, say plaintiffs, is there any evidence of the utilization of

the so-called "A–95" system within the State of Oregon to dispense such an investigation. Indeed, the affidavit of the A–95 coordinator discloses as much. Plaintiffs refer to the provisions of 40 C.F.R. § 1501.7(a)(1) which provides:

"Invite the participation of federal, state and local agencies, any affected Indian tribes, the proponent of the action, and other interested persons . . . ."

To similar affect are the provisions of 40 C.F.R. § 1503.1:

"The agency shall request the comments of appropriate state and local agencies which are authorized to develop and enforce environmental standards."

Plaintiffs point also to other substantive parts of 40 C.F.R. § 1501.7(a) relating to the scoping process as well as to the provisions of 40 C.F.R. § 1502.1 relating to the purposes of the EIS.

If it was not clear from the briefing, it became clear upon oral argument that the impacts likely to be sustained by Oregon territory and residents are not direct and consequential in comparison with the impact likely to be sustained by California territory and residents. The rivers in question have their situs in California. The designation with any attendant costs of maintenance and immediate effect upon quality of life are clearly sustained primarily in California. This is not to diminish the standing of the Oregon plaintiffs, but only as an aid in the evaluation as to whether or not there was a failure of compliance with the foregoing regulations of CEQ.

It is undisputed that eight scoping sessions were held as well as ten hearings concerning the DEIS. All of these were held in California, but some of them were within easy reach of Oregon residents. The administrative record reveals publication in the *Federal Register*, together with numerous press releases. There is no apparent contention that any of plaintiffs did not have actual notice of the proceedings so noticed.

In *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980), the court had before it a non-compliance with § 102(2)(C) of NEPA (42 U.S.C. § 4332(2)(C)), requiring a Federal official contemplating the taking of substantial Federal action to obtain comment in writing of any Federal agency having jurisdiction or expertise with respect to any environmental impact involved in the contemplated action. In upholding the refusal of the district court to issue an injunction on that ground the court said:

"Notwithstanding our conclusion that the corps violated NEPA by not obtaining the written official comments of USGS, we decline to hold that the district court should be reversed and an injunction issued on this ground. Relief under NEPA should be remedial rather than punitive."

The court found that literal non-compliance was excused by good faith effort to comply.

■ Because, as will be hereinafter discussed, possible impact of the designation in Oregon is secondary as distinguished from the primary nature of the impact to be experienced in California, it is understandable that good faith compliance could reasonably be interpreted to be the exact course followed herein. The supplemental administrative record discloses that the kind of notice given evoked substantial response from citizens of Oregon. The record before me does not suggest that by reason of some procedural failure the Secretary was deprived of the benefit of an alternative course of action. If it can be said that there was a literal failure of compliance with applicable regulations, a conclusion which I do not adopt, there is no showing as to how the remedial purposes of NEPA will be served by invalidating the EIS or enjoining its implementation on that ground alone. It is not clear to me how the participation of plaintiffs in the scoping and comment procedures would be enhanced had plaintiffs received notice through the A–95 coordinator. There is no suggestion that plaintiffs lacked actual notice through the means employed by defendants in terms of *Federal Register* publication, press notices and the like.

706

■ As stated in *Calvert Cliff's Coordinating Committee v. United States Atomic Energy Commission*, 449 F.2d 1109 (D.C.Cir. 1971), a distinction is drawn between the duty of an agency which is conducting a proceeding subject to NEPA in substantive matters and in procedural matters. In the latter less flexibility is permitted, and a court must reverse if a decision is reached procedurally "[W]ithout individualized consideration and balancing of environmental factors—conducted fully and in good faith...."

The record here does not impose a duty to overturn the secretarial decision upon procedural grounds.

## SUBSTANTIVE ADEQUACY OF THE EIS

■ The standard of review as to the adequacy of an EIS is well established in this circuit. In applying the standard the role of this Court is limited to a determination of whether the procedural requirements of NEPA have been met and whether the EIS serves its primary function of presenting the decision maker with an environmentally informed choice. *Save Lake Washington v. Frank*, 641 F.2d 1330 (9th Cir. 1981). The court has an essentially narrow substantive role in the sense that it cannot substitute its judgment for that of the decision maker, but can only analyze the procedural and substantive adequacy of the instrument presented to the decision maker for decisional action. The instrument must be adequate to assure that the investigative agency has taken a "hard look" at environmental consequences. *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Furthermore, the test of the adequacy of an EIS has been said to be pragmatic, which means that it is necessary to see if there has been a good faith attempt to identify and discuss all foreseeable environmental consequences. *Warm Springs Dam Task Force v. Gribble, supra.*

■ In the instant case, the essential allegation made by plaintiffs is that the EIS does not satisfactorily, or at all, evaluate the effect upon Oregon residents and economy of the diminution in timber production and sale which would of necessity accompany the designation of the five California rivers as a part of the National Wild and Scenic System. The argument is that if less California timber is harvested and sold, Oregon consumers of California timber must of necessity harvest Oregon timber which would otherwise go unharvested or be forced from the market. Attendant social costs of the latter such as loss of employment, loss of revenues, loss of recreational and quality of life uses are alleged. It is apparent that the impact which plaintiffs apprehend is a secondary impact as distinguished from a primary one. The matter of secondary impact was considered in *Trout, Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974), where the court recognized that to a given factual situation an EIS might be rendered defective because of an inadequate discussion of secondary impact. However, the court did not find that in every case such a discussion is to be regarded as a substantive requirement of the impact statement. The criteria of the necessity of secondary discussion is whether or not the secondary impact is a significant one.

■ Materials have been furnished to this Court, which currently at least indicate that the diminution of timber harvest through the instant designation is not sufficiently significant as to constitute a secondary impact of the sort which would require discrete treatment within the context of the EIS. It was stated at argument that under the "worst case" (alternative B of the EIS), view of the timber sales diminishment would lessen the timber available to Oregon users by 1.2% of total timber then available to Oregon users, while under the preferred alternative, as adopted and modified by the Secretary, a far less percentage of diminution in supply would ensue.

I think that an examination of the McKillop Report (Ex. 25 to Administrative Record), and the Pike and Cox affidavits, indicate that a triable issue of fact exists as to the significance of the secondary timber

impact upon the State of Oregon, its residents, agencies and entities. As illustrated by the affidavits, the subject matter is a complex one which can best be explored through trial.

Questions such as the applicability of the standard of "potential yield" of timber, as distinguished from "potential programmed harvest"; substantiality of impact of the designation upon state and private land, which of course are constituent parts of the whole environmental picture; and required emphasis on considerations of long term impact together with other factors, may bear upon the question of whether or not the required "hard look" was given to questions concerning Oregon.

If the secondary impact upon Oregon is of slender significance, its inclusion in the EIS may not be required at all; its inclusion and the adequacy of the treatment accorded it depend upon the relative significance which may be determined upon the trial of the issue.

## PRELIMINARY INJUNCTION

Plaintiffs seek the granting of a preliminary injunction in the respects indicated *supra*. The appropriate standard in considering this relief as pointed out by plaintiffs in their brief is articulated in *Los Angeles Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir. 1980).

"The traditional equitable criteria for granting preliminary injunctive relief are (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases) . . . .

In this circuit, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Inglis*, [9 Cir.] *supra*, 526 F.2d at [86] 88. These are not sepa-

rate tests, but the outer reaches 'of a single continuum.'" (634 F.2d at pp. 1200–1201.)

█ I find that plaintiffs do not fulfill these necessary criteria. Initially, as previously indicated, plaintiffs have not demonstrated as a matter of law that the procedural matters leading to the EIS are deficient. Therefore, the injunctive relief which might in appropriate circumstances be available to plaintiffs by reason of procedural deficiency, *cf., Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502 (D.C.Cir.1974), is not available to plaintiffs.

As pointed out in the Memorandum in Opposition to Preliminary Injunction, plaintiffs have not demonstrated any other substantive injury either present or imminently pending. The Court is aware that the combination of the press of business of this Court and the prolixity of the documents filed in connection with this motion have held this matter under submission for an extensive period of time. As a result, some affidavits may be stale and outdated. However, there is nothing on file tending to demonstrate any actual or impending injury to plaintiffs likely to cause them irreparable injury. The affidavit of Zane Grey Smith filed in the companion Del Norte case, but brought to the Court's attention as an exhibit to the Memorandum of Points and Authorities in Opposition to Preliminary Injunction filed by intervenor State of California in this case, indicates that Smith is the Regional Forester for the Pacific Southwest region for the United States Forest Service; that the designation of the five California rivers potentially affected only the Camp Seven timber sale and that no other awards of scheduled timber sales have been or will be delayed by the designation. He further states that no previously awarded timber sales have been affected and that the Forest Service will not by reasons of the designation make any changes in previously awarded timber sale contracts.

Furthermore, in a prepared statement made to the Subcommittee on Forest, Family Farms and Energy in the House of Rep-

resentatives, John B. Crowell, Jr., Assistant Secretary of Agriculture on October 15, 1981, announced the policy of extending timber sales made before January 1, 1981, and expiring before April 1, 1985, for up to two years, and to authorize an additional two year extension of sales previously extended.

Nothing before me indicates that plaintiffs are presently incurring any injury and in consequence no actual or imminent irreparable injury faces plaintiffs.

By reason of the decision in this case, the triable issue is limited to whether or not the EIS properly evaluated the secondary impacts sustained in Oregon by reason of the designation. I cannot say that plaintiffs have demonstrated a probability of success on the merits sufficient to constitute a compliance with that requisite for preliminary injunctive relief. Put another way, although plaintiffs have demonstrated that a substantial questions exists for determination in this case they have not demonstrated that the balance of hardship tips markedly in their favor. *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86 (9th Cir. 1975). In consequences, the application for preliminary injunction is denied.

### CONCLUSION

Plaintiffs' Motion for Summary Judgment and for Preliminary Injunction is denied; defendants' Motion for Summary Judgment is denied as to the third claim and granted as to the first, second and fourth claims.