**ORION PICTURES DISTRIBUTION COR-PORATION, Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,**

v.

**SYUFY ENTERPRISES, Defendant-Counter-Claimant-Appellee-Cross-Appellant.**

**Nos. 86–6341, 86–6370.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1987.

Decided Oct. 9, 1987.

James L. Seal, Beverly Hills, Cal., for plaintiff-counter-defendant-appellant-cross-appellee.

Maxwell M. Blecher, Los Angeles, Cal., for defendant-counter-claimant-appellee-cross-appellant.

Robert B. Nicholson, Washington, D.C., for U.S. as amicus curiae.

Before HALL and LEAVY, Circuit Judges, and AGUILAR,* District Judge.

LEAVY, Circuit Judge:

Appellant, Orion Pictures Distribution Corporation, a movie distributor, brought this action against appellee/cross-appellant, Syufy Enterprises, a movie exhibitor, alleg-

---

* Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation.

ing antitrust violations, fraud, and breach of contract. In its antitrust claims, Orion alleged that Syufy violated § 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing and attempting to monopolize the Las Vegas movie exhibition market. Syufy counterclaimed, alleging violations of the antitrust laws, breach of contract, fraud, and unfair competition. Trial was by jury. At the conclusion of Orion's case, the district court granted Syufy's motion for a directed verdict against Orion's antitrust and fraud claims. The directed verdict against the antitrust claims was based on the court's findings that Orion had presented insufficient evidence of monopoly power or a dangerous probability of attaining such power; predatory conduct indicating an intent to control prices or destroy competition; and antitrust injury.

Syufy withdrew those portions of its counterclaim alleging violations of the antitrust laws and breach of contract. After Syufy presented its evidence, the district court granted Orion's motion for a directed verdict against the remaining portions of Syufy's counterclaim (fraud and unfair competition). The court also granted Orion's motion for a directed verdict on its breach of contract claim and submitted the issue of contract damages to the jury. The jury returned a verdict in the amount of $-0-. Orion appeals the directed verdict against its antitrust claims. Syufy cross-appeals the directed verdict against its unfair competition claim. We affirm the directed verdicts.

## PERTINENT FACTS

Orion is a motion picture distributor; Syufy is a motion picture exhibitor. Syufy owns and operates approximately 280 screens in theaters in California, Nevada, Arizona, New Mexico, and Utah. In 1981, Syufy entered the Las Vegas walk-in first run movie exhibition market when it opened the six screen Cinedome complex. After the opening, four theater operators then competed for licenses to show first run films: Mann Theatres, which owned the Boulevard Twin Theatre (two screens), and the Fox Charleston Theatre (one screen); Plitt Theatres, which owned the Parkway Theatre (three screens); Cragin Industries, which owned the Red Rock Theatre (eleven screens); and Syufy.

Before Syufy entered the market, there were rarely enough first run films to fill the 17 existing screens. Exhibitors competed intensively in bidding for first run pictures. Bids for licenses to show films were above the national level before the Cinedome opened. When the Cinedome opened, bidding competition increased.

In October or November of 1982, Syufy representatives approached the Mann Theatres' owner "saying that with the increased competition in Las Vegas, the fact that film rental was going up and that our profits, we were both getting killed, that it would be their [Syufy's] desire to take us [Mann] out of the marketplace." In January 1983 Syufy bought both Mann theaters. Shortly beforehand, Syufy had acquired Plitt's Parkway Theatre. Syufy also attempted to buy the eleven screen Red Rock, but was not willing to pay what Cragin Enterprises wanted.

Cragin and Syufy continued to compete in 1983 and 1984. Syufy paid 73.2% of its Las Vegas box office gross in film rental in 1984 compared to the national average of 58–60% for first run films. Syufy also paid "guarantees" for films far in excess of what it paid for the same film elsewhere.

Orion solicited bids for *The Cotton Club* in July 1984. These bids were solicited and received before exhibitors saw the film, a practice known as blind bidding. At a July 31, 1984 meeting between Syufy and Orion officials, Orion told Syufy no screening prints were available. Orion's head of distribution saw a "rough cut" of the movie in May. A major investor in the movie saw a print in June which he considered of sufficient quality to allow him to form an opinion of its box office prospects. Because of disputes between this investor and the film director, the movie underwent constant changes.

Syufy submitted a bid to license *The Cotton Club* for showing in Las Vegas during the Christmas season. The bid included a $152,000 guarantee. Orion award-

ed the license to Syufy. Orion also awarded *The Cotton Club* to Syufy in several other locations. Syufy's bids for those locations also contained guarantees.

Meanwhile, Syufy was increasingly interested in buying Red Rock to "end the blood bath" that "was a result of the bidding" in Las Vegas. By acquiring Red Rock, Syufy hoped to reduce the guarantees it had been paying for films, particularly guarantees on blind bidding.

On October 18, 1984, Syufy bought Red Rock. Syufy then owned all 23 first run movie screens in Las Vegas.

On October 23, 1984, Syufy saw the trade screening of *The Cotton Club.* Three days later Syufy cancelled its guarantees on *The Cotton Club,* including the $152,000 Las Vegas guarantee. Syufy claimed that *The Cotton Club* was not as good as represented by Orion and that, contrary to Orion's representation, a viewable version was available when the blind bids were solicited.

Syufy offered to show the film under the remaining terms of the contract (i.e., pay Orion a percentage of the actual box office receipts), but Orion refused to deal with Syufy. Instead, Orion placed the film in other theaters. Because theaters with the largest grossing potential had already licensed films to show during the Christmas season, the replacement screens were generally inferior to the Syufy screens. As a result, Orion received total film rentals of $320,358 for *The Cotton Club,* in contrast to the $579,000 in guarantees which Syufy had repudiated.

## STANDARD OF REVIEW

On appeal from a directed verdict, the standard is "whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party." *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.,* 498 F.2d 1137, 1140 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974) (citations omitted). The evidence must be viewed in the light most favorable to the nonmoving party, who is entitled to the benefit of all reasonable inferences that may be drawn from the evidence. *Id.*

## DISCUSSION

### *Antitrust Claims*

When the district court granted Syufy's motion for a directed verdict against Orion's antitrust claims, the court concluded that Orion had not presented evidence of monopoly power or antitrust injury. We affirm because Orion has not suffered antitrust injury. We do not reach the sufficiency of Orion's evidence of monopoly power.

Antitrust injury is a necessary element of both monopolization and attempted monopolization claims. *Syufy Enters. v. American Multicinema, Inc.,* 793 F.2d 990, 993, 998–99 & n. 13 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). To be compensable in a treble damage action under the antitrust laws, plaintiff's injury must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "The antitrust injury concept ... requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation." II P. ARREDA & H. HOVENKAMP, ANTITRUST LAW, ¶ 335.1 at 229 (1986 Supplement).

This circuit recently affirmed the dismissal of a complaint for failure to state an antitrust claim on facts similar to those presented here. *Newman v. Universal Pictures,* 813 F.2d 1519 (9th Cir.1987). *Newman* concerned allegations of a conspiracy among motion picture studios to fix the percentage of revenues paid to artists under contract with the studios. The conspiracy allegedly arose after the artists had entered into the contracts. The court affirmed dismissal of the artists' antitrust claims stating:

Under the generous standard we apply to antitrust complaints, we must decide

whether there is any set of facts consistent with the allegations of the complaint which would establish an antitrust injury to these plaintiffs with respect to the marketing of these films. None has been urged on us. Appellants' fundamental problem is that [the plaintiffs] entered into the contracts ... before the alleged conspiracy arose.... The subsequent conspiracy could not have affected the competition for [plaintiffs'] services at the time the contracts were made.

*Id.* at 1522.

Orion claims as antitrust damages the difference between Syufy's repudiated guarantees for *The Cotton Club* and what it received in film rentals from the replacement theaters. Orion asserts that this constitutes antitrust injury because Syufy's monopolization of the Las Vegas market was for the purpose of reducing the guarantees it paid on films. According to Orion, Syufy's repudiation of *The Cotton Club* guarantees was made possible by its monopolization.

■ Orion's damages do not constitute antitrust injury. The purpose of the antitrust laws is to protect competition. Syufy's alleged monopolization did not affect the competition to license *The Cotton Club* at the time of bidding for the movie. After *The Cotton Club* was licensed, Syufy's duties to Orion were fixed by its contractual commitment to pay guarantees. Because competition was no longer a factor in determining Syufy's obligation to Orion, Orion's injury does not "reflect the anticompetitive effect" of Syufy's alleged monopolization. Orion has suffered a breach of contract, not an antitrust injury.

*Unfair Competition Claim*

■ Syufy cross-appeals the district court's grant of a directed verdict against its unfair competition claim. Syufy asserts that Orion had a screenable print of *The Cotton Club* which Orion could have shown exhibitors when it solicited blind bids on the film. Syufy claims that Orion's solicitation of blind bids violated California Business and Professions Code § 17200 which defines unlawful competition as "unlawful, unfair, or fraudulent business practice." Cal.Bus. & Prof.Code § 17200 (West

1987). Syufy does not contend that all blind bidding violates the statute.

Syufy's evidence showed that a "rough cut" of *The Cotton Club* was available in May, which Orion considered not suitable for screening, and that in June a major investor saw another "rough cut" which was of sufficient quality to allow him to form an opinion of its profitability. Orion did not disclose that it had a "rough cut" version to Syufy; it told Syufy it had no version suitable for screening.

Contrary to Syufy's assertion, the bidding on *The Cotton Club* was no different from that which occurs in all blind bidding situations. The film was in a stage of production which the distributor considered not suitable for screening. Consequently, exhibitors bid without seeing the film. California does not prohibit blind bidding as a general practice. Therefore, we decline to hold that it constitutes an unfair trade practice under California Business and Professions Code § 17200.

### CONCLUSION

The judgment of the district court is affirmed.