931 F.2d 1338
 59 USLW 2725, 1991-1 Trade Cases 69,452,
21 Fed.R.Serv.3d 1239
 Z CHANNEL LIMITED PARTNERSHIP, Plaintiff-Appellant,
v.
HOME BOX OFFICE, INC.; MGM/UA Telecommunications, Inc.;
Paramount Pictures Corporation; Twentieth Century
Fox Film Corporation; Warner Brothers,
Inc. Defendants-Appellees.
 No. 88-6576.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 7, 1990.
Decided April 30, 1991.
 
 Maxwell M. Blecher, Blecher & Collins, Los Angeles, Cal., for plaintiff-appellant.
 John D. Donovan and Frank Rothman, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for defendant-appellee, Home Box Office, Inc.
 James A. Schreier, Christensen, White, Miller, Fink & Jacobs, Los Angeles, Cal., for defendant-appellee, MGM/UA Telecommunications, Inc.
 Louis A. Meisinger, Hill, Wynne, Troop & Meisinger, Los Angeles, Cal., for defendant-appellee, Twentieth Century Fox Film Corp.
 Appeal from the United States District Court for the Central District of California.
 Before CANBY, KOZINSKI and THOMPSON, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 In this antitrust action, Z Channel Limited Partnership appeals the district court's grant of summary judgment in favor of Home Box Office, Inc., ("HBO") and several movie producer-distributors. Z Channel contends that the district court erroneously interpreted Newman v. Universal Pictures, 813 F.2d 1519 (9th Cir.1987), cert. denied, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988), as requiring dismissal. HBO contends that events since the grant of summary judgment have rendered this case moot. We hold that this case is not moot, and that the district court erroneously applied Newman. Accordingly, we reverse and remand.
 
 FACTS and PROCEEDINGS
 
 2
 Z Channel[1] and HBO both provide pay television services over cable to the Los Angeles area. HBO also produces and distributes movies to other cable providers, as do the other defendants. This lawsuit concerns agreements between Z Channel and its distributors, and between HBO and its distributors, prohibiting Z Channel from displaying paid advertisements. Z Channel contends that the enforcement of those agreements at the insistence of HBO violates antitrust laws. The facts, viewed in the light most favorable to Z Channel, the nonmoving party, are as follows.
 
 
 3
 For several years Z Channel displayed movies, which it acquired through licensing agreements from defendant studios or distributors (including HBO) who hold the copyrights to the titles. The licensing agreements between Z Channel and the defendant distributors were embodied, initially, in "master agreements" which set out the terms and conditions of the licensing of the first movies rented. These master agreements also contemplate a continuing relationship regarding future movie rentals, through subsequent "amendments" or "letter agreements." Each amendment or letter agreement is separately negotiated and signed by the parties but, unless a modification is negotiated, the amendment incorporates by reference the terms of the master agreement. One provision of those master agreements precludes Z Channel from carrying paid advertising during the period for which the movies are licensed.[2]
 
 
 4
 HBO--as a cable channel--acquires movies from the other defendant distributors in the same manner. In HBO's master licensing agreements with its distributors, there is a provision which prohibits those distributors from licensing the same movies to any other cable television channel which carries any paid advertising. Thus, Z Channel's ability to display paid advertising is constrained by two sets of agreements: the "no-advertising" clauses in its master agreements, and the "no-licensing-to-advertisers" clauses in HBO's master agreements.
 
 
 5
 In early 1988, Z Channel switched to a format that mixed movies and sports, and decided to display paid advertising during its sports segments. Such a format would have violated both sets of agreements prohibiting advertising.
 
 
 6
 Z Channel attempted to negotiate modifications in its licensing agreements with its distributors to permit paid advertising during sports programming. Apparently, those negotiations were to modify existing licenses and to permit more lenient licenses of future films.[3] Z Channel alleges that it was unsuccessful in those negotiations, at least in part, because HBO insisted that the distributors comply with their no-licensing-to-advertisers agreements with HBO. Z Channel alleges that as a consequence of these events, it was required to show the sports programs (for which it had contracted) without paid advertising, and, further, that HBO cancelled its licensing agreement with Z Channel.
 
 
 7
 Subsequently, Z Channel brought this action, charging in Count One that the enforcement of and insistence on the various "no-advertising" agreements constituted unreasonable restraints of trade in violation of section 1 of the Sherman Act, for which Z Channel sought declaratory and injunctive relief. In Count Two, Z Channel charged that the agreements were the result of a group boycott, also in violation of section 1 of the Sherman Act, and sought declaratory and injunctive relief as well as damages. Z Channel also appended state law contract and tort claims, for which it sought damages.
 
 
 8
 After discovery, Z Channel abandoned Count Two. HBO sought summary judgment as to Count One and the district court granted it, finding that "Newman controls" (referring to Newman v. Universal Pictures, 813 F.2d 1519 (9th Cir.1987), cert. denied, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988)). The district court thus ordered all counts dismissed. After this appeal was filed, new owners acquired Z Channel and have instituted an all-sports program. Apparently, Z Channel has completely stopped showing movies, and does not contemplate showing movies in the future.
 
 ANALYSIS
 I. Mootness
 
 9
 We are faced with a threshold issue of mootness. The only claim remaining in this case is that alleged in Count One of the complaint. The only relief expressly requested in connection with that Count was declaratory and injunctive relief, to permit Z Channel to show licensed movies along with sports programming that is interspersed with commercials. Because Z Channel has changed its format and neither shows nor contemplates showing movies, its prayer for declaratory and injunctive relief is clearly moot. For this reason, HBO contends that the entire appeal should be dismissed for mootness. Z Channel, on the other hand, contends that it is entitled to seek damages if it succeeds in proving its Count One claim, and that the case therefore is not moot. On this record, we agree with Z Channel.
 
 
 10
 If Z Channel is entitled to collect damages in the event that it succeeds on the merits, the case does not become moot even though declaratory and injunctive relief are no longer of any use. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 459, 77 S.Ct. 912, 919, 1 L.Ed.2d 972 (1957). A case or controversy still exists because the parties are disputing whether enforcement of and insistence on the no-advertising agreements constituted an unreasonable restraint of trade. If Z Channel prevails, it may recover damages for loss of advertising revenue. Federal Rule of Civil Procedure 54(c) allows the district court to award damages if Z Channel proves facts entitling it to relief even though Z Channel never requested damages.
 
 
 11
 It is clear that Z Channel did not foreclose relief in damages by failing to ask for them in its Count One prayer. "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed.R.Civ.P. 54(c) (emphasis added); see also Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978) ("a meritorious claim will not be rejected for want of a prayer for appropriate relief"); Western District Council v. Louisiana Pacific Corp., 892 F.2d 1412, 1416-17 (9th Cir.1989) (holding case not moot because court could grant remedy of rescission even though plaintiff had not requested this remedy); Sias v. City Demonstration Agency, 588 F.2d 692, 696 (9th Cir.1978) (holding district court erred in concluding that it could not grant reinstatement because plaintiff failed to request such remedy); Sapp v. Renfroe, 511 F.2d 172, 176 n. 3 (5th Cir.1975) (plaintiff raises request for damages for first time on appeal; court notes Rule 54(c) allows award of damages in this situation).
 
 
 12
 HBO asserts, however, that it is far too late for Z Channel to talk of damages now. It points out that we dismissed a portion of an appeal for mootness in Dan Caputo Co. v. Russian River County Sanitation Dist., 749 F.2d 571, 574 (9th Cir.1984), because only declaratory and injunctive relief had been requested and the moment had passed when those remedies might have been useful. We think that HBO reads too much into Caputo. In Caputo there was no indication that damages were sought even as late as appeal, or that damages would have been appropriate for that challenge by a non-bidder to a public bid-solicitation process. As we said, "There remains no effective relief which we can offer Caputo/Wagner." Id. The same situation prevailed in two other cases where we dismissed appeals because declaratory and injunctive relief had become moot; no damages were ever sought, and no case or controversy existed because the court was unable to grant effective relief. See Fair v. EPA, 795 F.2d 851, 854 (9th Cir.1986); Enrico's Inc. v. Rice, 730 F.2d 1250, 1254 (9th Cir.1984).
 
 
 13
 Here, Z Channel now seeks damages,[4] and Count One of its complaint, construed favorably to it, alleges restraints that could have resulted in financial damage to Z Channel. We conclude, therefore, that the damages remedy is sufficiently before us to preclude a dismissal for mootness. We turn, therefore, to the merits.
 
 II. The Merits: Antitrust Injury
 
 14
 A grant of summary judgment is reviewed de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); State Farm Fire and Casualty Co. v. Martin, 872 F.2d 319, 320 (9th Cir.1989). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989); Judie v. Hamilton, 872 F.2d 919, 920 (9th Cir.1989).
 
 
 15
 The anticompetitive activity that Z Channel complains of in Count One occurred in response to Z Channel's decision, announced in early 1988, to carry advertising in connection with its sports broadcasts. Implementing that decision would have violated prohibitions on advertising contained in preexisting contracts between Z Channel and its distributors, and between those distributors and HBO. Much or all of the alleged harm to Z Channel arose either from the enforcement of those preexisting contract terms, or from the refusal to modify those terms in new contracts referencing the preexisting contracts. For that reason, the district court concluded that Z Channel's claim failed for lack of any showing of antitrust injury, under the rule announced in Newman v. Universal Pictures, 813 F.2d 1519 (9th Cir.1987), cert. denied, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). We conclude that the district court applied Newman too broadly, and we accordingly reverse.
 
 
 16
 Newman was a claim brought by Paul Newman, the actor, and George Roy Hill, a director, who had contracted to supply their services to Universal in the making of the feature films "Slapshot" and "The Sting." The contracts provided for Newman and Hill to receive a percentage of revenue from exhibition of the films. Subsequently, technological developments led to a market for the films in videocassettes. Newman and Hill claimed that Universal and other major studios had conspired to apply the profit participation clauses in their contracts in such a way as to minimize the amounts paid to Newman, Hill and other artists.
 
 
 17
 We upheld a dismissal of Newman's and Hill's action for failure to state a claim of antitrust injury. Crucial to our analysis was the fact that the only injury to competition that was alleged or urged was the competition for Newman's and Hill's services in making the two named films. We said:
 
 
 18
 The subsequent conspiracy could not have affected the competition for Newman and Hill's services at the time the contracts were made. Furthermore, the alleged conspiracy could not have affected appellants' ability to negotiate with other studios for distribution of the video cassettes, because the existing contract covered distribution of the film in all forms.... Thus, if the alleged conspiracy did not restrain competition for Newman and Hill's services in "The Sting" and "Slapshot," there can be no resulting antitrust violation.
 
 
 19
 Id. at 1522.
 
 
 20
 The defendants extract from Newman a broad rule that interpretations and applications of contracts that preexist the anticompetitive activity cannot, as a matter of law, cause antitrust injury. The key, however, is not merely that Newman's and Hill's contracts predated the conspiracy; it was that the only competition alleged to be injured predated the conspiracy. When Newman and Hill signed contracts to perform in or direct "The Sting" and "Slapshot," the competition among movie producers for those services ended. A later conspiracy, whatever other damage it may have caused, could not injure that competition.
 
 
 21
 It is true in the case before us that some competition ended when Z Channel entered contracts to exhibit certain movies on its channel. Competition among distributors to rent those movies to Z Channel for cablecasting at the specified times clearly ended with the signing of that contract. Any later conspiracy to enforce that agreement could not cause injury to the competition among distributors for sale of the contracted movies or times.
 
 
 22
 But the present case involves two other forms of competition in existence when the defendants allegedly acted illegally. First, during the time when Z Channel was contemplating its inclusion of paid advertising during sports broadcasting, it was negotiating with distributors for licenses for new movies. Those negotiations involved competition among distributors to rent movies to Z Channel, and conversely, among cable channels (including Z Channel) to rent movies from distributors. Included (at least implicitly) in those negotiations for new licenses was Z Channel's proposal to advertise during sports broadcasting.
 
 
 23
 Those negotiations were conducted in the shadow of the preexisting "master" licensing agreements, but they were, nevertheless, negotiations for new contracts. The master licenses permitted subsequent modification of any term, and the terms of the master license controlled only if new terms were not adopted by agreement of the parties.
 
 
 24
 Thus, the competition between cable channels and distributors for the license rights to films was continuing when the distributors were insisting on retaining their "no-advertising" clauses in new licenses, and, more significantly, when HBO was insisting that the other distributors continue to insist upon those clauses in any new licenses they might grant. To the extent that these actions by HBO and the other distributors injured that competition, the requirements of causation and competitive injury to Z Channel have been met.
 
 
 25
 Z Channel has also alleged injury to another, more general, area of competition in which it was participating at the time of the alleged antitrust violations--the struggle for competitive viability in the cable television market. Z Channel alleged that HBO coerced the distributor defendants to apply their licensing agreements with Z Channel to prevent Z Channel from advertising during its cablecasting of sports events. Second Amended Complaint para. 41. It further alleged that this action was taken so that "Z Channel, in the short run, will be a less effective and viable competitor to HBO and barred from entering the market for pay television offering both movie and sports programming, and, in the long run, would likely be eliminated as a competitor altogether...." Id. at para. 46. Thus,
 
 
 26
 Defendants' interpretations and applications of their licensing agreements with plaintiff Z Channel Limited Partnership would have injurious effects on competition, including the diminishment of competition among and between pay television services and a restriction on consumer choice among pay television services and different pay television programming.
 
 
 27
 Id. at para. 53.
 
 
 28
 We think it clear from these allegations that Z Channel is asserting an injury to competition that postdates the anti-competitive activity of which it complains--the actions by HBO and the other defendants to enforce the "no-advertising" clauses in their existing licensing contracts, and to retain those clauses in new contracts. It may be true, as to those licenses already negotiated, that Z Channel had prospectively limited its future competition with other cable services when it entered the license agreements with "no-advertising" clauses.[5] However, as to those licenses for which Z Channel was continuing to negotiate, it was clearly competing with other cable channels, not only for the rights to certain films, but also for survival and success in the cable television market.
 
 
 29
 Those distributors who, of their own independent choice, elected to enforce their "no-advertising" restrictions, or insisted on retaining those restrictions in subsequent licenses were doubtless entitled to do so. Assuming the legality of the contract,[6] its collateral effect of limiting competition between Z Channel and other cable services would have been permissible.
 
 
 30
 Part of Z Channel's case, however, is that the distributors were not free to relax their restrictions and permit Z Channel more vigorously to compete with other cable services, because HBO in its capacity as a competing cable service[7] coerced the distributor defendants to enforce their agreements against Z Channel. According to Z Channel, HBO could accomplish this result because of its dominant market position and because its own contracts with distributors, at HBO's insistence, contained clauses prohibiting distributors from licensing films covered by the HBO licensing agreement to other services if they advertised.[8] This action by HBO and the acquiescence of the distributor defendants, enforced with the aid of HBO's contracts with the distributors, is the anti-competitive activity of which Z Channel complains.[9] And that conduct was clearly capable of causing an injury to the competition between Z Channel and the other cable services, including HBO.
 
 
 31
 The defendant distributors contend that each acted wholly independently in enforcing its "no-advertising" clause against Z Channel. They offered evidence in support of that position. Z Channel, however, offered contradictory evidence that HBO threatened action against the distributors under HBO's contracts if the distributors did not enforce and retain the "no-advertising" restrictions against Z Channel, and that the distributors responded to that pressure. We cannot say as a matter of law that there is no triable issue whether HBO's actions, acting upon the distributors, caused competitive injury to Z Channel.
 
 
 32
 We conclude, therefore, that Z Channel's case is not foreclosed by Newman,[10] because the anticompetitive activity of which Z Channel complains could have caused injury to competition between Z Channel and other cable services.[11] Having concluded that Newman does not control this case, we decide nothing further. The district court did not rule on the legality of the contracts in issue, the reasonableness of any restraints on trade, or any other possibly decisive issues, nor do we. We reverse simply because the district court's conclusion that Newman controls was in error, and we remand for further proceedings. Nor, for lack of a sufficient record, do we address the asserted deficiencies in plaintiff's standing that were likewise not ruled on in the disposition of the motion for summary judgment.
 
 
 33
 REVERSED AND REMANDED.
 
 KOZINSKI, Circuit Judge, dissenting:
 
 34
 This case is dead, procedurally as well as substantively. By breathing new life into it, my colleagues create much business for the lawyers but ill-serve the interests of the parties and the cause of sound judicial administration.
 
 
 35
 * A. The Federal Rules of Civil Procedure are clear as mountain spring water: All complaints must include "a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a)(3) (emphasis added). Z Channel's complaint does not demand money damages; it seeks only declaratory and injunctive relief, neither of which can now be granted. There's nothing left; we must dismiss.
 
 
 36
 The majority reaches the contrary conclusion by focusing on Fed.R.Civ.P. 54(c). But my colleagues are looking at the wrong end of the elephant. Fed.R.Civ.P. 54(c) governs final judgments; parties who have litigated a case to completion are entitled to all available relief. Rule 54(c) only applies, however, after the case has been fully litigated; it says nothing about what a plaintiff must put in its complaint in order to get to judgment. That issue is governed by Rule 8(a)(3), which has a much lower number because it comes into play long before Rule 54(c). If plaintiff does not satisfy Rule 8(a)(3) by stating a claim for available relief, it never gets to Rule 54(c).
 
 
 37
 The long and short of it is that the majority has rendered Fed.R.Civ.P. 8(a)(3) meaningless in contested cases. If Rule 54(c) automatically cures any and all failures to state a prayer, Rule 8(a)(3) becomes nothing more than friendly advice. It is, of course, totally inappropriate to construe two parts of a statute--or two rules of civil procedure--so that one will cancel out the other. See Nieto v. Ecker, 845 F.2d 868, 873 (9th Cir.1988); 2A N. Singer, Sutherland Statutory Construction Sec. 46.06 (4th ed. 1984). Yet, that is what the majority has done today.
 
 
 38
 B. My colleagues leap over two hurdles with a single bound by also ignoring the rule that claims may not be raised for the first time on appeal. The fact of the matter is, Z Channel never said boo in the district court about damages under count I. The majority nonetheless concludes that the issue is "sufficiently before us," majority at 1341, because Z Channel is raising the issue now.[1] But now is far too late, as we are in the court of appeals, not the district court. It goes without saying that to preserve an issue for appeal, one must first present it to the trial court; all issues not raised below are deemed waived. See Image Technical Service, Inc. v. Eastman Kodak Co., 903 F.2d 612, 615 n. 1 (9th Cir.1990); United States v. Whitten, 706 F.2d 1000, 1012 (9th Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); 10 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure Sec. 2716, at 650-54 (2d ed. 1983). This is the approach adopted by the Seventh Circuit in James Luterbach Constr. Co. v. Adamkus, 781 F.2d 599, 603 (7th Cir.1986), and the Fifth Circuit in H.K. Porter Co. v. Metropolitan Dade County, 650 F.2d 778, 782 (5th Cir.1981), cited in James Luterbach, 781 F.2d at 603. The majority creates a conflict without so much as a nod to our sister circuits.[2]
 
 
 39
 The case for waiver is stronger here than it was in James Luterbach and H.K. Porter. In those cases, the plaintiff neglected to include any prayer for damages in the initial complaint, id.; the failure may indeed have been an oversight. But damages were not overlooked or forgotten here. Z Channel's complaint, carefully tailored by experienced counsel, requested damages for some claims but not for others. Compare Second Amended Complaint pp 65-66 (seeking injunctive relief and damages), with id. pp 54-56 (seeking only injunctive and declaratory relief). Z Channel then voluntarily dismissed the count that included a prayer for damages and proceeded only on its claim for declaratory and injunctive relief.
 
 
 40
 If Z Channel, a well-heeled litigant represented by one of the giants of the antitrust bar, is not bound by its litigation choices, who is? How can the majority reconcile its decision with White v. McGinnis, 903 F.2d 699 (9th Cir.1990) (en banc), cert. denied, --- U.S. ----, 111 S.Ct. 266, 112 L.Ed.2d 223 (1990), where we held that an incarcerated civil rights plaintiff, who complied fully with the Federal Rules of Civil Procedure, nevertheless abandoned his constitutional right to a jury by failing to reassert it at trial? I see no reason to cut Z Channel more slack than we did poor Mr. White.
 
 
 41
 By holding that Z Channel has a viable claim for damages, the majority in effect grants Z Channel leave to amend its pleadings to include such a claim, inverting the roles of the trial and appellate courts. Under the Federal Rules and our case law, the decision whether to permit an amendment belongs to the district judge. See Fed.R.Civ.P. 15(a). Our job is only to review for abuse of discretion. Thomas-Lazear v. FBI, 851 F.2d 1202, 1206 (9th Cir.1988). The majority's elephant is not merely backwards, it's upside down.
 
 II
 
 42
 The majority engages in judicial necromancy yet again when it resurrects a substantive theory Z Channel long ago let expire, bringing this case back from the dead not once but twice.
 
 
 43
 A. This case got started because Z Channel wanted to include advertising in its programming but ran into a problem: Movie distributors refused to license films to Z Channel unless it agreed not to; they also refused to release Z Channel from the no-advertising clauses in existing licenses. The reason for this refusal is no mystery; it is well documented in the record.
 
 
 44
 In general, distributors insist on no-advertising restrictions in pursuit of a marketing strategy with a fancy name, "sequential window licensing," and a straightforward goal--making more money. Declaration of Chase Carey, Senior Vice President of Twentieth Century Fox Film Corp., SER 57, at 164. Here's how it works: At each stage of a film's life (in each "exhibition window," as the denizens of Hollywood would say), the distributor licenses the film to one type of exhibitor only. A major release starts out in its "first run," playing in a few, select theaters. When the film gets older and interest dies down, the distributor licenses it to additional theaters at a lower rate for a "second run" or "roll out" (e.g. "now showing at theaters and drive-ins everywhere"). See United States v. Syufy Enterprises, 903 F.2d 659, 665 n. 7 (9th Cir.1990). Still later the film becomes available on videotape; eventually it is shown on pay t.v.--television supported entirely by subscription fees and not by advertising. Last of all, it appears on stations that include advertising (free cable and network television).
 
 
 45
 By licensing films one window at a time, the distributor accomplishes what economists call price discrimination.[3] See R. Posner, Economic Analysis of Law 259-260 (3d ed. 1986); A. Alchian & W. Allen, University Economics 125-27 (3d ed. 1972). Price discrimination maximizes film revenues without restricting supply, but it only works to the extent film distributors are able to keep the exhibition windows separate. See id. at 126. Theaters are willing to pay premium license fees for a film only if everyone who wants to see it immediately must pay full price; few patrons would pay $7 a ticket if they could rent the same movie on video for $3.
 
 
 46
 This case involves the same phenomenon as to a different exhibition window: Subscription television companies are willing to pay top dollar for a license only if they know viewers can't see the same movie on another channel for free. Hence, distributors generally include no-advertising restrictions in their licenses to pay t.v. exhibitors. Similarly, when HBO buys a license, it insists that licenses to other exhibitors also contain no-advertising clauses; that way HBO doesn't pay a bundle only to find its would-be patrons watching the same film on another channel for nothing.
 
 
 47
 B. These restrictions are at the heart of Z Channel's complaint: The film distributors insisted on their no-advertising clauses and HBO stood on its right not to have the movies it exhibits licensed to stations supported by advertising. So Z Channel sued. First, it claimed that HBO's licenses with distributors and the distributors' insistence on no-advertising clauses were unreasonable restraints of trade. That theory is still in the case, assuming there's a case left at all; and as the majority correctly points out, it's not barred by Newman v. Universal Pictures, 813 F.2d 1519 (9th Cir.1987), cert. denied, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988).[4] So far, so good.
 
 
 48
 The majority, however, goes on to address another claim: that HBO coerced distributors into keeping the no-advertising restrictions. That claim simply isn't part of the case anymore. Who says so? Z Channel, for one:
 
 
 49
 [The only remaining count] attacks a licensing agreement and ... is limited to licensing agreements constituting an unreasonable restraint of trade....
 
 
 50
 No matter how much you examine [that count], your honor, you will not find the word boycott, you will not find the word conspiracy, and you will not find the word[s] concert of action. [It] charges that the contracts themselves, the licensing agreements and the enforcement of those licensing agreements violate[ ] [Sherman Act] section 1.
 
 
 51
 Transcript of Oral Argument before the District Court, RT 7, (Sept. 22, 1988) (emphasis added).
 
 
 52
 Z Channel abandoned the coercion theory with good reason: There's not a morsel of evidence to support it. All the evidence Z Channel managed to muster was the contracts themselves. As Z Channel's counsel explained:
 
 
 53
 What we have here are agreements between HBO and the defendant studios which have been enforced against Z Channel, that is the essence of this case and ... that is why we are still in court.... What we are talking about is whether we qualify under section 1 by having alleged that the contracts between HBO and the defendants precluding their relicensing pictures to competitors of HBO which would permit those competitors to advertise, whether that contractual restraint standing alone and ... viewed cumulatively reached a level of an unreasonable restraint of trade.
 
 
 54
 Id. at 8-9.
 
 
 55
 But why take his word for it? A quick look at the record confirms that the coercion theory just doesn't hold water. According to MGM/UA, one of the alleged victims of coercion, "HBO did not force us into [our] deals with it.... In fact, HBO's license with us expressly provides for our right to render that license non-exclusive (subject, of course, to a substantial reduction in the license fee paid to us by HBO)." Declaration of Anthony Lynn, Executive Vice President, International Television and Worldwide Pay Television of MGM/UA Telecommunications, Inc., SER 20, at 98. And what about Twentieth Century Fox? "Fox's decision [to not license movies to Z Channel if it advertised] was not due to any alleged pressure from or coercion by HBO...." Carey Declaration, SER 57, at 191.
 
 
 56
 Instead, film distributors refused to modify their agreements because doing so would have blurred two exhibition windows, decreasing revenue. "The plain and simple fact is that Fox has independently, and for valid business and economic reasons ... determined to enforce its purposefully negotiated rights under the Fox-Z Channel License Agreements. It has done so to preserve ... its Sequential Window Licensing Strategy ... to maximize Fox's total revenues from the licensing of all of its Theatrical Films." Carey Declaration, SER 57, at 192-93. As Anthony Lynn of MGM/UA Pictures explained, licensing to a station that includes advertising while pay t.v. stations are willing to buy licenses is like "turning gold into lead." Supplemental Lynn Declaration, SER 47, at 139-40; see Declaration of Alan Cole-Ford, Former Vice President of Video Distribution, Paramount Pictures Corporation, SER 39, at 133 (Paramount's use of no-advertising clauses designed to maximize revenues); Lynn Declaration, SER 20, at 96 (enforcement of windows is to maximize the value of the films); Declaration of Edward Bleier, President of Warner Bros. Domestic Pay-TV, Animation & Network Features, SER 48, at 150-51 (regardless of contractual restrictions imposed by the Warner-HBO agreements, Warner believed that permitting Z Channel to include commercial advertising in its format would harm Warner's window marketing strategy and economic interests).[5]
 
 
 57
 C. The majority nonetheless points an accusatory finger and pronounces the evidence sufficient to support a coercion theory. Majority at 1343-1344. But what facts do my colleagues recite? That Twentieth Century Fox received "a bad letter" from HBO, majority at 1344 n. 8, and subsequently refused to license Z Channel any films without a no-advertising clause. From that the majority infers that HBO threatened to boycott Fox if it licensed any films to Z Channel--even films for which HBO hadn't taken a license. Id. But all HBO's letter does is remind Fox of it's contractual obligations:
 
 
 58
 As you are no doubt aware, HBO has licensed from you the right to exhibit motion pictures during periods when those pictures will not be available on any service or channel which carries advertising.... [C]ontemporaneous appearance of programming on the HBO services and on an advertiser supported service would substantially lessen the value, and compromise one of the most distinguishing features, of the HBO services. Consequently, the Agreement prohibits such contemporaneous appearance.
 
 
 59
 Accordingly, please be advised that should Z Channel proceed with its announced plans to include such advertising on its service, and should Z Channel exhibit any motion picture licensed to us ..., HBO shall deem such exhibition a material breach [of contract].
 
 
 60
 Letter from HBO to 20th Century Fox, February 29, 1988, ER 142, Exhibit G (emphasis added). There's absolutely no mention of movies not already under license to HBO; there's no coercion. All HBO did was to stand on its contracts. If there's any reason to remand to the district court, it's for a determination whether HBO's contracts amount to an unreasonable restraint of trade, not for trial on a coercion theory.[6]
 
 
 61
 Z Channel wisely gave up its coercion claim when it discovered there was no evidence to support it.[7] The majority would do well to respect that informed decision rather than encourage the parties to litigate a dispute that no longer exists.
 
 Conclusion
 
 62
 Once in a while big, interesting, difficult cases implode, leaving nothing for us to decide. When this happens, we should sweep aside the rubble, not compress it until it turns into a judicial black hole that sucks up productive resources of cosmic proportions. Defying a clear rule of procedure, creating an inter-circuit conflict and resurrecting a legal theory long ago abandoned by the parties makes no sense to me at all. This case is dead. R.I.P.
 
 
 
 [1]
 Ownership of Z Channel has changed at least twice in the course of this litigation. The question of who owns Z Channel (and the rights to this litigation) has been presented as an issue of standing in this appeal, but, as indicated below, we remand for further factual findings in that regard. For the purposes of this opinion, we treat the ownership as if it were unchanged
 
 
 [2]
 The no-advertising clauses vary in their formulations, and thus in their scope. For purposes of this appeal we assume that they all prohibit advertising completely (during sports broadcasting as well as during movie broadcasting), since that interpretation is the most favorable to Z Channel, the party resisting summary judgment below. The district court, on remand, is not bound by this assumption, of course, and will have to interpret the various contracts, insofar as necessary to resolve the merits of Z Channel's claim
 
 
 [3]
 The fact that Z Channel was negotiating for licenses for new movies during this time is not pleaded. In fact the complaint seems to indicate that Z Channel is only complaining of interpretation and application of existing licenses for films already licensed. See Second Amended Complaint, paras. 41-44. Z Channel first explicitly refers to continuing competition for new movies in its Opening Brief in this appeal. Appellant's Opening Brief at 21 ("[T]he negotiating for and licensing of movies by defendants and Z Channel through licensing agreements and their subsequent amendments is an ongoing competitive process. This process has been taking place up to and through defendants' imposition of their advertising prohibition.")
 The evidence provided in opposition to summary judgment, however, indicates that, at least in part, Z Channel was negotiating for licenses for new movies when it was negotiating with the distributors about its ability to broadcast movies and also to broadcast paid advertising. Similarly, the evidence indicates that at least some of the movies licensed to Z Channel before it stopped showing movies were licensed after its attempt to broadcast advertising was frustrated.
 We assume as true Z Channel's allegations, even though they are ambiguous on this score, at best. Newman, 813 F.2d at 1522 ("In an antitrust action, the complaint need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws.") (citing Lucas v. Bechtel Corp., 633 F.2d 757, 760 (9th Cir.1980)).
 
 
 [4]
 Unlike the dissent, we do not read Z Channel's opening brief as disavowing any claim for damages. Z Channel merely states that it was not seeking damages "arising from antitrust violations that produce the breach of a pre-existing contract." Appellant's Opening Brief, p. 14. Z Channel's point is that it is not seeking the same kind of relief as that sought in Newman. The dissent takes the remarks out of context
 
 
 [5]
 Even as to those licenses already granted, all practical prospect of competition by means of advertising had not ended. Z Channel has alleged and offered some evidence to support the fact that it was negotiating with the distributors to relax their "no-advertising" restrictions. Indeed, two distributors did so, and they are not defendants in this action
 
 
 [6]
 Z Channel contends that the licensing agreements containing restrictions on advertising were themselves contracts in restraint of trade, in violation of section 1 of the Sherman Act. The district court did not rule on that point, nor do we. Of course, the contracts were ones to which Z Channel was itself a party
 
 
 [7]
 HBO also acted as a distributor, licensing Z Channel to show certain movies to which HBO owned the rights. With regard to restrictions it imposed on advertising by direct licensing agreement between itself and Z Channel, HBO is in the same position as the producer-distributor defendants
 
 
 [8]
 Indeed, there is evidence in the record supporting the inference that HBO was insisting on a broader restriction on licensing to advertisers than contained in its contracts with the other distributors. Those contracts prohibited HBO's distributors from licensing the same movies they had licensed to HBO to other cable services that carried advertising. See, e.g., ER 154, Exh. B at 32. But the communications from the other distributors to Z Channel indicate that HBO was insisting that if HBO were to continue licensing any movies from the distributors, those distributors could license no movies to a cable service that carried advertising, regardless of whether there was overlap in the movies rented. See, e.g., ER 3, Exh. D (Mar. 3, 1988 letter from Twentieth Century Fox to Z Channel) ("[T]his confirms that 20th Century Fox cannot, under any circumstance, license films in the Pay TV window to any subscription Pay TV service which contains advertising."); ER 5, at 13-14, para. 33 (Declaration of Joseph Cohen) ("[20th Century Fox executive] had received a 'bad letter' from HBO and would have to 'toe the line.' She explained that this meant Fox could not allow Z Channel to exhibit Fox films if Z Channel were to contain any advertising. She added, 'Fox doesn't want to be the bad guys. We would love to keep giving Z Channel product but the advertising issue is of a big concern to HBO' ")
 
 
 [9]
 The defendants contend that Z Channel's Count One, so construed, depends upon a showing of conspiracy and any such showing is foreclosed because Z Channel abandoned its conspiracy count, Count Two, and it was dismissed with prejudice. We do not construe Z Channel's abandonment of its Count Two conspiracy claim as precluding any showing of joint action in support of its Count One claim. Z Channel has not helped to clarify matters at all by arguing that its Count One claim is a Section 1 "contract" claim and that contracts are mutually exclusive of conspiracies. It is difficult to understand how a contract in restraint of trade can be entered and enforced without agreement between parties. We also note that Count One alleges that the contracts between the distributors and Z Channel were contracts in restraint of trade, but does not directly allege that the contracts between HBO and the distributors, that forbade the distributors to license to operators who carried advertising, were contracts in restraint of trade. We do not regard that omission as fatal to Count One. The allegations of coercion of the distributors by HBO were broad enough to encompass use of its contract restrictions
 
 
 [10]
 It also is not foreclosed by Orion Pictures Distribution Corp. v. Syufy Enterprises, 829 F.2d 946 (9th Cir.1987), the only other case in this circuit to apply Newman. In Orion, we held that a breach of contract after the defendant had achieved monopoly power did not constitute "antitrust injury," for a Sherman Act section 2 monopolization claim because the injury to competition in that case (allegedly acquiring monopoly power) had ended before the defendant's injury (loss of revenue from the broken contract) occurred. Id. at 948-49
 
 
 [11]
 Nor do we regard this as a case like R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139 (9th Cir.1989), which presented the question whether a plaintiff who might be viewed as peripheral to the competition in issue had antitrust standing and could claim antitrust injury. Here, Z Channel is alleging an injury to competition between itself and other cable producers. Assuming that Z Channel can prove its claims, it has no difficulty meeting the five-part test set forth by the plurality in Dick: the factors of directness of the injury, lack of more appropriate plaintiffs, and nature of the injury to it as a participant in the competitive market, easily bring Z Channel within the Dick plurality test. See id. at 146-48. The difference between Newman and the present case is particularly well captured in the statement by the Dick plurality that "[m]ere injury as a landlord or lessor entitled to royalties would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent. 'The requirement that the alleged injury be related to anticompetitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors.' " Id. at 148, (quoting Bhan v. NME Hosp., Inc., 772 F.2d 1467, 1470 (9th Cir.1985))
 
 
 [1]
 Whether plaintiff is in fact raising it even now is a highly debatable point. Z Channel has repeatedly told us it is not seeking damages. In its opening brief, Z Channel wrote:
 [P]laintiff is not seeking money damages arising from antitrust violations that produce the breach of a pre-existing contract. Instead, the injury Z Channel alleges and is trying to stop arises from defendants' continued unjustifiable enforcement of a contractual restriction against advertising, which adversely affects Z Channel's current and future ability to compete....
 Appellant's Opening Brief at 14 (emphasis added). Z Channel stuck to this position with monotonous consistency: "[Z Channel] is not claiming as its antitrust injury specific dollar amounts of damage arising from defendants' breach of pre-existing contracts...." Id. at 19 (emphasis added); see also id. at 21 n. 14. Nowhere does plaintiff make the claim that the majority attributes to it, nowhere that is until its response to the suggestion of mootness.
 
 
 [2]
 While, as my colleagues note, the Fifth Circuit had reached the contrary conclusion in Sapp v. Renfroe, 511 F.2d 172, 176 n. 3 (5th Cir.1975), that court has since revisited the issue and placed itself in line with the Seventh Circuit. See H.K. Porter, 650 F.2d at 782
 
 
 [3]
 Some forms of price discrimination are prohibited under section 2(a) of the Robinson-Patman Act, 15 U.S.C. Sec. 13(a). No Robinson-Patman violation is claimed here
 
 
 [4]
 In Newman, the plaintiffs contended that various studios had conspired to interpret contracts so as to deny the plaintiffs royalties from videotape distribution of movies they had worked on. We held that they had not alleged antitrust injury, having failed to show injury to competition or themselves as competitors. Newman, 813 F.2d at 1522. Here, Z Channel alleges that it was unable to compete with HBO for subscribers and cable-space because HBO had, through its contracts with distributors, prevented Z Channel from acquiring the raw materials (i.e. movie licenses) it needed to compete. Cf., e.g., Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 325-27, 333, 81 S.Ct. 623, 627-28, 631, 5 L.Ed.2d 580 (1961) (challenge to reasonableness of requirements contract for coal on grounds it foreclosed the supply of coal in the relevant market). As such, it has alleged both injury to competition and harm to itself as a competitor--in short, antitrust injury. Whether it can establish an antitrust violation on the basis of the no-advertising clauses in the distribution contracts is another story
 
 
 [5]
 The testimony of the alleged victims is particularly damning in light of their obvious economic interests: In the absence of an agreement between HBO and the defendant distributors to share monopoly rents--an agreement everyone agrees cannot be proven--the distributors have nothing to gain and everything to lose by helping HBO destroy its competitors. HBO would become a monopsonist, the only buyer in the pay t.v. window; the distributors might well be at its mercy
 
 
 [6]
 The defendants did not argue in support of summary judgment that the contracts were reasonable as a matter of law and the district court did not address that issue; accordingly, neither do I
 
 
 [7]
 Z Channel's decision was particularly well-advised considering its evidentiary burden: It had to exclude the possibility of independent action; even proof that the distributors' conduct came in response HBO's complaints would not have been enough. See Monsanto v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)