**In re Rose ENRIQUEZ, Debtor.**

**No. 03–51229–ASW.**

United States Bankruptcy Court, N.D. California.

Sept. 22, 2004.

*wealth of Va. (In re Perry),* 254 B.R. 675 (Bankr.E.D.Va.2000);

Lars T. Fuller, The Fuller Law Firm, San Jose, CA, for Debtor.

## MEMORANDUM DECISION SUSTAINING OBJECTION TO CONFIRMATION BY COMERICA BANK, IN PART

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is confirmation of the plan ("Plan") proposed by Rose Enriquez, the Debtor in this Chapter 13[1] case ("Debtor").

Comerica Bank ("Bank") asserts a claim against the Debtor and filed an objection to confirmation alleging that the Plan was not proposed in good faith and does not treat the Bank's claim in the manner required by law. At trial, the Bank raised for the first time an objection based on the Debtor's lack of eligibility for Chapter 13 relief due to debts exceeding the limits fixed by § 109(e)—in closing argument,

---

1. Unless otherwise noted, all statutory references are to Title 11, United States Code ("Bankruptcy Code"), as applicable to cases commenced on February 26, 2003.

counsel for the Debtor objected to those grounds being initially asserted at trial, but contended that the Debtor was not ineligible under the statute.[2]

The Debtor is represented by Lars T. Fuller, Esq. of The Fuller Law Firm. The Bank is represented by Barbara Cray, Esq. of Law Offices of Barbara Cray. The matter has been tried and submitted for decision.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## I.

### FACTS

The facts are largely undisputed, although the parties disagree as to their interpretation.

The Debtor testified that she commenced a sole proprietorship business known as Omega Mailing Services ("Omega") in December 1995. Omega processed bulk mail for companies and its major customer was Marketing Response Systems, Inc. ("MRSI"). MRSI was a corporation wholly owned by Frank Brauch and his wife Joan (collectively, "Brauchs"), and the Debtor believed it to be "a very strong business and very well kept". The Brauchs decided to sell MRSI and the Debtor negotiated with them in August or September 1999 to buy the stock of the corporation for $580,000. At that time, the business had some equipment in the form of printers, computers, and desks, but the Debtor considered its primary assets to be

"very good will, very strong work flow", and approximately $200,000 cash on hand.

On February 22, 2000, the Debtor and the Brauchs signed an agreement ("Sale Agreement") for the Debtor to buy the stock of MRSI, although the Debtor said the document was actually prepared in late 1999. The Sale Agreement calls for the $580,000 purchase price to be paid in the form of a $29,000 cash down payment, a bank loan of $493,000, and two $29,000 promissory notes carried by the Brauchs— one unsecured note with monthly payments made over five years, and one note due in ten years without interim payments but secured by a certificate of deposit.

The Debtor testified that she submitted an application for the loan to the Bank in September 1999 and began discussing the transaction with bank personnel in October 1999—first with Joe Baker ("Baker") and then with Marie Anderson ("Anderson").[3] According to the Debtor, she included an unsigned copy of the Sale Agreement in the "package" requested by the Bank, along with a handwritten financial statement that she prepared in September 1999. The information in the latter document was used by the Bank to prepare a typewritten version, which the Debtor signed in February 2000 ("Financial Statement"). The Financial Statement showed $35,000 cash on hand and the Debtor testified that those funds were in Omega's account in September 1999. However, they had been "used" by the beginning of 2000 because Omega "went into a transition" and "went through a very difficult time", eventually losing the lease of its business premises and having to operate

---

**2.** Devin Derham–Burk, the Chapter 13 trustee, has also filed an objection to confirmation, on the grounds that unsecured debt exceeds the maximum amount permitted by § 109(e). That objection was not tried with the Bank's objection, and remains pending.

**3.** Neither Baker nor Anderson testified. The Bank's attorney said that Anderson had left the Bank's employ and moved to another state, where she could not be located.

out of the Debtor's home. The Debtor had to borrow funds for the down payment from her brother in Mexico, which loan was repaid with cash of MRSI on March 22, 2000, immediately after escrow closed for the sale. The Debtor testified that her attorney and counsel for the Brauchs told Anderson that the Debtor no longer had the $35,000 cash shown on the Financial Statement, and said that she also "spoke with" both Baker and Anderson "about getting the money from Mexico". The Debtor testified that the Financial Statement reflected the conditions that existed in September 1999 when she prepared the handwritten version, rather than the actual state of affairs in February 2000 when she signed the typed version, although she acknowledged that she wrote "2/24/00" at the top of the typed form after the language "Personal Financial Statement As of".

On December 6, 1999, the Bank issued a letter ("Commitment Letter") signed by Anderson, stating the terms and conditions under which the Bank would agree to lend money for the purchase of MRSI. The Debtor signed at the bottom of the Commitment Letter on December 9, 1999, following the sentence "I(we) have read and agree to the terms and conditions of the proposed credit facilities described in this letter". The terms set forth in the Commitment Letter call for, *inter alia*, 75% of the loan to be guaranteed by the Small Business Administration ("SBA"), a principal amount of $493,000 amortized over a ten year period, a variable interest rate and monthly payments of $6,862, collateral in the form of a senior security interest in the assets of MRSI and Omega, a down payment of at least $29,000, and "Seller financing in the amount of $58,000.00 to be on full standby (no payments) for the life of the SBA loan". The Debtor's signature appears twice, once labelled "Marketing Response Systems by Rose Enriquez, President", and once labelled "Rose Enri-

quez, as Guarantor"—however, the body of the Commitment Letter identifies "Borrower" as MRSI and the Debtor, and states "n/a" in the space provided for the names of "Guarantors".

The Debtor testified that the "full standby" provision of the Commitment Letter (prohibiting payments to the Brauchs until the Bank loan had been repaid) must have been merely "a proposal" because it contradicted the Sale Agreement, a copy of which was in the Bank's possession at that time. The Sale Agreement provides that the Brauchs' ten year note is "fully subordinate" to the Bank loan and no payments are to be made on it "prior to maturity" without approval from the Bank, but the five year note is not made subject to such restrictions—as to that note, $616.17 is to be paid monthly and the maker "may at any time prepay the balance due on said note without penalty". Nevertheless, the Debtor also said that, when she signed the Commitment Letter on December 9, 1999, she did agree to its "full standby" provision concerning both notes.

The Debtor testified that, a week later, on December 16, 1999, she sent a memo to Anderson by means of facsimile transmission ("FAX"). The memo states that the Debtor had decided that the "best interest" of MRSI would be served by prepaying the Brauchs' ten year note within the next two years, if possible, rather than paying interest for the full term, and:

> The SBA may have as the condition of the loan that Mr.Brauch's note be fully subordinate for the term however, I would be irresponsible in my role as fiduciary to the corporation by allowing the loan continue to its term.

The memo bears no address or FAX number and Debtor said that she had no FAX cover sheet or proof that it was sent, and "have not been able to find" a response

from the Bank. Debtor testified that she discussed the memo with Anderson by telephone on more than one occasion and was told that it would be "no problem" to prepay either of the Brauchs' notes. (As noted at footnote 3 above, Anderson did not testify). The ten year note was not prepaid, but it was secured by a certificate of deposit that Debtor caused to be purchased with MRSI's cash. The five year note was paid in full the month after escrow for the sale closed in March 2000, using MSRI's cash.

Joyce Wagoner ("Wagoner") testified that she is a Vice President of the Bank's Special Assets Group, with over eleven years' experience handling loans that develop "problems", most of them guaranteed by SBA. Wagoner explained that the Bank's policy was that a loan subject to SBA guarantee would not be made without first receiving and fully complying with SBA's written authorization ("Authorization"), which states the conditions under which SBA will guarantee the loan. In this case, the Authorization included a requirement that the Bank receive from the Brauchs a "standby agreement" for each of the two $29,000 notes, providing for the Brauchs to receive no payments on either note except $616.17 per month for the five year note, until the Bank loan had been paid in full. Wagoner testified that the Bank's file contained no documents concerning any change of the Authorization's terms, nor any notes of discussions about making any changes. She said that the Bank wanted SBA guarantees to be honored, so its policy was that it would not deviate from SBA requirements without prior written approval from SBA, and she was not aware of that ever having happened. Wagoner stated that it was at least a year after close of escrow that she learned from the Debtor about the five year note having been prepaid, and about

the certificate of deposit securing the ten year note.

Wagoner testified that it was "unusual" for the Bank to make a loan for purchase of a business such as MRSI, which had little equipment but a large amount of cash. Wagoner said that the Bank relied on the cash being used to acquire certain equipment, noting that the Bank's "risk rating" report ("Risk Rating Report") for the proposed loan stated a "weakness" to be:

> Loan is under-collateralized; however, there will be significant capital expenditures made which will add new equipment to our collateral base.

The Risk Rating Report (which appears to be an internal Bank document and is not signed by the Debtor) sets forth that the $200,000 cash on hand "is expected to be used" for six items of equipment and the cost of leasing new business premises. However, no such requirement that the Debtor buy any specific pieces of equipment is contained in the Note or in any other document signed by the Debtor. The Debtor testified that she did enter into the new lease, but bought only one of the pieces of equipment, an in-line tabber machine for $22,000; she also bought a delivery van for $5,000 that was not among the six items listed in the Risk Rating Report. The Debtor said that she had intended at first to purchase more equipment than she ultimately did buy, but decided to have two of the listed items (an inserter machine and an ink-jet system) leased by Omega rather than bought by MRSI, and not to acquire three of the listed items (a folder machine, forklift, and pallet racking) at all, because "at the time I felt it was necessary for me to keep some of the cash on hand to run the business in a more healthy way and that's what took place".

The Debtor testified that, after escrow closed in March 2000, MRSI continued to employ the Brauchs for three months with monthly salaries totalling $10,700; the Debtor received no salary from MRSI during that period, though she did receive one from Omega. When the Brauchs left, the Debtor began receiving a salary from MRSI of $2,000 per month until 2001, when the amount increased to $3,000 per month, or $3,500 "probably a couple of times" if cash flow permitted—in some months during late 2002 and early 2003, she received only $1,000. In addition to the Debtor, MRSI also employed Tim Holcomb with a monthly salary of $3,000.

The Debtor testified about payments that both MRSI and Omega made to her or for her benefit, other than salary. Between October 9, 2000 and July 2, 2003, MRSI issued twenty-one checks to the Debtor totaling $13,141.35—the Debtor said that "many times" she would pay business expenses of both companies and receive reimbursement, and that was the reason for some (but not all) of these checks, although she could not provide details. Between April 25, 2003 and July 2, 2003, MRSI issued six checks to Omega totaling $14,988.47—those payments were made after Omega had ceased doing business, but the Debtor said that MRSI continued to operate until June and was using some of Omega's equipment, so some of the funds were applied to equipment leases held by Omega (although she could not give details). On May 30, 2002, MSRI paid $2,800 in rent for the Debtor's home, where both MSRI and Omega were operating at that time—the Debtor said that the rent for those premises was sometimes paid by MRSI and sometimes by Omega; between December 30, 2000 and December 1, 2002, Omega issued nine checks totaling $25,020 to the lessor of those premises. Omega also paid the Debtor's dentist bills totaling $255.40 between December 31, 2000 and May 20, 2001, which she said was done "so I could record for tax purposes", though she would use her own account for such payments "if I had funds". After it had ceased doing business (and after commencement of the Debtor's Chapter 13 case), Omega issued nine checks between March 10, 2003 and June 1, 2003 totaling $3,612.46—the Debtor said that $687.52 was for repairs to her personal vehicles that were used for business purposes, $1,688 was used for a dinette set because she had run out of personal checks, and the balance was for "tiny amounts" owed to vendors that she "did not want to list" in her bankruptcy schedules.

The Debtor testified that, after she acquired MRSI, its business "went up," with 2000 being a "very good year" and part of 2002 being "very strong". However, toward the end of 2002, MRSI lost one of its "main customers" representing 35% or 45% of annual sales and never recovered, "especially with the economy being in this state". Omega then stopped billing MRSI for services, so its own revenues were also affected. Omega ceased operations in 2003, prior to commencement of the Debtor's Chapter 13 case on February 26, 2003. However, the Debtor intended to continue MRSI's operations and did so using Omega's equipment until the end of May 2003. At that point, the ink jet system and inserter were repossessed and MRSI stopped doing business. The Debtor said that all remaining equipment of Omega and MRSI was put in storage and the keys were given to the Bank.

The schedules that the Debtor originally filed in her Chapter 13 case include stock in MRSI worth $10,000 and the Omega business worth zero, but no business equipment. Scheduled creditors include MRSI with a note for $217,371.47 and the Bank with an unsecured claim of $37,000 described as "Undersecured est. deficiency

on cross-collateralized loan"—on May 13, 2003, the schedules were amended to show the amount of the Bank's unsecured claim as "Notice Only". An original and two amended plans were also filed, none of which include the Bank as a secured creditor—the most recent version provides for no dividend to general unsecured creditors after payment of a secured automobile loan and a secured tax claim, with all equipment of Omega being surrendered to the Bank. The Debtor testified that the scheduled value of her interest in MRSI was a "rough estimate" that she made without any expert advice. With respect to Omega being valued at zero, she said that Omega's assets did have value but she did not list a figure because she "knew that Omega and MRSI were responsible for the loan and the collateral was for operating the business so I was confused as to how I could do this and that's what took place"—she did not schedule the equipment itself because "it was part of the [Bank's] collateral". According to the Debtor, the scheduled $217,371.47 debt to MRSI merely reflected an "allocation of money in the accounting system" that was made by an accountant "just for tax purposes", and neither the Debtor nor Omega actually received that amount from MRSI—the amount includes funds of MSRI that were used to make payments to the Bank, to repay the loan for the down payment, and to pay off the Brauchs' five year note. The Debtor stated that the Bank was not treated as a secured creditor with a lien on Omega's assets because she "intended to continue doing business as MRSI". As for the amount of the Bank's claim, the Debtor said that the originally scheduled amount of $37,000 was based on what she believed to be the total amount of default, and she intended to continue operating MRSI and pay the loan in full—however, she did not consider herself to be directly obligated to the Bank once MRSI

ceased operations and believed the loan to be owed by MRSI and Omega, with her role limited to being a "warrantor" who would not be liable unless MRSI failed to pay.

The Bank loan is represented by a promissory note ("Note") dated March 8, 2000. The Note states near the top of its first page that "Borrower" means MRSI and the Debtor. The sixth and final printed page states as follows:

12. BORROWER'S NAMES AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Marketing Response Systems, Inc.

Rose Enriquez

Marketing Response Systems, Inc.

By:

By:

x

Rose Enriquez

Wagoner testified that the first place where the two names appear on page 6 identifies the borrowers and does not call for a signature. However, the Debtor signed on the second line following her printed name, rather than where the individual borrower was supposed to sign, after the "x" on the last line labeled "Rose Enriquez". The Debtor also signed on the first line under the corporate name, after "By:", and wrote underneath that line "Rose A. Enriquez President". According to Wagoner, who was not involved in the transaction when the Note was signed, it was the Bank's intention that the borrowers be MRSI and the Debtor, with each liable for the loan. The Debtor testified that she signed the Note along with many other documents for close of escrow, without having time to read them all or compare them with each other. She said that her attorney was not present and had not

reviewed the documents, no one explained them to her, and she just signed where the Brauchs' attorney "was pointing me to sign"—both the Debtor and Wagoner testified that no representative of the Bank was present, and Wagoner said that the Bank typically did not send a representative when a business escrow was used. Counsel for the Bank noted that the Debtor had stated in deposition testimony that she "understood that both [MRSI] and [the Debtor] had an obligation to repay" the Note, and agreed that she was required to repay it—when asked whether she had "any dispute" that both owe the balance due under the Note, the Debtor replied "Disputes? I just don't have a way to repay the loan". At trial, the Debtor said that she "wasn't very clear on what I should respond there" because the documents were "very confusing", the deposition "went for such a long time, there were so many questions", and "now that I have taken a close look at the documents I see that they're confusing". Debtor acknowledged that, between January 10, 2001 and April 15, 2002, four checks totaling $7,574.24 were issued from Omega's account to the Bank.

The Debtor testified that the Bank loan was in default when she filed her Chapter 13 petition on February 26, 2003, and Wagoner testified that the last payment was received on November 8, 2001. The Bank's records show that the outstanding balance on January 1, 2002 was $462,295.47. The Bank has filed a proof of claim in the Debtor's Chapter 13 case for $479,657.93, asserting that it is secured to an unknown extent by collateral in the form of "business assets, machinery, and equipment"; there is no record of the

Debtor having filed an objection to the claim. Wagoner testified that the total due as of January 12, 2004 was $482,148.64 after applying all payments and other receipts. The Bank's records show three credits totaling $37,742.59[4] that represent funds received from the Brauchs and liquidation of collateral. According to Wagoner, the Bank sued the Brauchs to recover the prepayments that they had accepted from the Debtor in violation of their standby agreements with the Bank, and settled that litigation. Wagoner was unaware of any collateral that had not been liquidated.

## II.

### ANALYSIS

■ The Bank's written objection to confirmation of the Debtor's Plan was based only on the Plan having been proposed in bad faith and failing to treat the Bank's claim in the manner required by law. At trial, the Bank raised for the first time the Debtor's lack of eligibility for Chapter 13 relief due to debts exceeding the limits fixed by § 109(e). In closing argument, counsel for the Debtor urged that the Bank should not be permitted to raise an objection to eligibility for the first time at trial, when it was not pled in the written objection to confirmation—however, he also argued that the Debtor was not ineligible, based on the evidence at trial and the provisions of the statute.

#### A. Lateness

Rule 15(b) of the Federal Rules of Civil Procedure ("FRCP")[5] provides that pleadings may be amended to conform to the evidence:

---

4. The credits were applied on November 14, 2003, December 12, 2003, and December 18, 2003 in the respective amounts of $1,500, $16,000, and $20,242.59

5. FRCP 15(b) has been incorporated by FRBP 7015, which in turn is made applicable to contested matters—such as objections to plan confirmation—by FRBP 9014(c).

Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

The application of this rule is explained by *In re Jodoin*, 209 B.R. 132, 136 (9th Cir. BAP 1997):

Generally, a party cannot succeed on a cause of action not stated in the complaint. [Footnote omitted.] *See generally Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 814 (9th Cir.1994) ... (quoting *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466(9th Cir.1990) ("[T]he main purpose of the complaint is to provide notice of what the plaintiff's claim is and the grounds upon which the claims rest.... [The] plaintiff must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery."); *Save Lake Washington v. Frank*, 641 F.2d 1330, 1339 (9th Cir.1981)). However, FRCP 15(b) [footnote omitted] permits the parties to consent implicitly to amendments to the pleadings based on the actual trial. FRCP 15(b) is to be construed liberally. *See* 6A Charles Alan Wright, [Arthur R. Miller & Mary Kay Kane,] *Federal Practice and Procedure* § 1491 (2d ed.1990); 3 James Wm. Moore, *et. al, Moore's Federal Practice* ¶ 15.13[2] (1996).

In this case, counsel for the Debtor stated in closing argument that he objected to the Bank raising the eligibility issue for the first time at trial, but he did not object to evidence concerning that issue, and he addressed the merits in argument. Furthermore, FRCP 54(c)[6] provides (in pertinent part) that:

Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party is entitled, even if the party has not demanded such relief in the party's pleadings.

As the trial court pointed out in *In re Jodoin*, 196 B.R. 845, 851–852 (Bankr. E.D.Cal.1996):

The court is obliged to award the plaintiff the relief to which she is entitled under the evidence adduced at trial, so long as such relief is within the court's jurisdiction. Fed.R.Civ.P. 54(c); [footnote omitted] Fed.R.Bankr.P. 7054. It does not matter that the relief has not been requested. *See, e.g., Z Channel Ltd. Partnership v. Home Box Office, Inc.*, 931 F.2d 1338 (9th Cir.1991).[¶] The key qualification is that the failure to have demanded the appropriate relief

6. FRCP 54(c) has been incorporated by FRBP 7054, which in turn is made applicable to contested matters—such as objections to plan confirmation—by FRBP 9014(c).

must not have prejudiced the adversary in the defense of the matter. 10 *Wright & Miller* § 2664; 6 *Moore* ¶ 54.62. In this context, prejudice refers to lack of opportunity to present additional evidence to meet the unpleaded issue. Hence, prejudice has been found where forewarning would have led to additional evidence that was not otherwise relevant to the issues that were expressly raised in the pleadings. *Rivinius, Inc. v. Cross Mfg., Inc. (In re Rivinius, Inc.)*, 977 F.2d 1171, 1177 (7th Cir.1992). But prejudice has not been found to exist when the additional evidence would also have been relevant to the issues that were expressly raised. *Rental Dev. Corp. v. Lavery*, 304 F.2d 839, 842 (9th Cir.1962).

In this case, counsel for the Debtor expressed no prejudice and did not contend that he would present more or different evidence if he were given additional time. As discussed below, the facts concerning eligibility have been tried without a timely objection by the Debtor, the legal issues are a matter of black letter law, and there is no prejudice to the Debtor in ruling on that question now.

### B. Merits

Pursuant to § 109(e) an individual is eligible to be a debtor under Chapter 13 only if she "owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than [$290,525] and noncontingent, liquidated, secured debts of less than [$871,550]".[7]

The Debtor contends that she does not owe a debt to the Bank because the loan was taken by MRSI and the Debtor acted only as a "warrantor". The Debtor pleads confusion about her role in the loan transaction, but the Bank argues that the documents she signed speak for themselves and are not ambiguous. It is true that the Debtor's signature on the Commitment Letter is labeled "as Guarantor", but the body of that document identifies the borrowers as both MRSI and the Debtor, and states that the capacity of guarantor is "n/a", *i.e.*, not applicable. Some three months later, the Debtor signed the Note, which identifies the borrowers twice (once at the top of the first page and again on the signature page) as being both MRSI and the Debtor, and which makes no reference to guarantors. The Debtor signed the Note twice, once on a line designating a representative of MRSI, and again on a line labeled only with her name and with no qualifying term such as "guarantor". The Debtor testified that she was represented by counsel but that her attorney was not present when the documents were signed and had not reviewed them, and the Debtor did not read everything that she signed—she does not complain that the Bank somehow misled or coerced her into signing under such circumstances. Furthermore, the Debtor caused Omega to make over $7,500 in loan payments to the Bank for a period exceeding one year, which arguably is inconsistent with a belief that only MRSI was liable for the loan. Finally, there is no evidence that the Debtor ever expressed confusion to the Bank, and she admitted at deposition that both she and MSRI were liable for the loan.

 Even if the Debtor were not directly liable for the Bank loan, she characterizes herself as a "warrantor" who would be liable if MSRI were to default. Counsel for the Debtor contended in argument that, if the Debtor were merely a guarantor, the debt to the Bank would be a contingent one for purposes of § 109(e)

---

**7.** Pursuant to § 104(b)(1), the amounts are periodically adjusted. The amounts set forth above apply to cases commenced between April 1, 2001 and March 30, 2004.

because the Debtor's liability had not yet arisen when the Chapter 13 case was commenced. But the Debtor testified that the Bank loan was in default when she filed her Chapter 13 petition on February 26, 2003, and the Bank's records show that no payment had been received since November 8, 2002, over three months pre-petition. Pursuant to *In re Fostvedt*, 823 F.2d 305, 306–307 (9th Cir.1987) ("*Fostvedt*"):

> [T]he rule is clear that a contingent debt is "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor." *Brockenbrough v. Commissioner*, 61 B.R. 685, 686 (W.D.Va.1986), quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D.Tex.1980), *aff'd. per curiam*, 646 F.2d 193 (5th Cir.1981).

According to the Debtor's own understanding of her role as "warrantor", the "extrinsic event which will trigger the liability of the debtor" was the default of MRSI, which Debtor concedes occurred pre-petition. Accordingly, on the date of bankruptcy, if Debtor had liability as a guarantor, such liability would be non-contingent for purposes of § 109(e). Therefore, whether Debtor was liable as a principal obligor or as a guarantor, she was liable for a non-contingent debt to the Bank.

■ The Debtor also argues that the debt to the Bank was unliquidated when the Chapter 13 case was commenced, because it was partially secured and the value of the collateral was not known. The Ninth Circuit has defined "liquidated" under § 109(e):

> [W]hether a debt is liquidated "turns on whether it is subject to 'ready determination and precision in computation of the amount due.' "

*Fostvedt*, at 306 (9th Cir.1987).

> The definition of "ready determination" turns on the distinction between a sim-

ple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability.

*In re Wenberg*, 94 B.R. 631, 634 (9th Cir. BAP 1988), *aff'd*, 902 F.2d 768 (9th Cir. 1990). The Debtor did not dispute the amount of the debt itself at trial, nor has she objected to the claim filed by the Bank. The extent to which that debt was secured on the date of bankruptcy is the only issue that has been raised and the evidence does not suggest that determining the value of the collateral would require "an extensive and contested evidentiary hearing in which substantial evidence may be necessary". The collateral was personal property consisting primarily of a few pieces of used equipment, which could easily have been appraised. For purposes of § 109(e), the debt to the Bank is a liquidated one despite the fact that it was partially secured by collateral with a value that has not been precisely determined, because that value was and is capable of "ready determination".

■ As set forth above, the maximum debt permitted by § 109(e) is less than $290,525 in unsecured debt and less than $871,550 in secured debt. Pursuant to *In re Scovis*, 249 F.3d 975 (9th Cir.2001), a debt is secured for purposes of § 109(e) only to the extent of the value of the collateral, with any balance being treated as unsecured. The Bank's records showed the total amount owed on January 1, 2002 to be $462,295.47, with no reduction thereafter until November 2003; accordingly, the debt when the Chapter 13 case commenced on February 26, 2003 was at least $462,295.47. The evidence does not show what the value of the collateral was on that date, but there is some indication of its value later in the year, when the Bank

applied a total of $37,742.59 to the debt after having liquidated all collateral. That figure includes receipts from litigation with the Brauchs and there is no itemization of what portion is attributable to the collateral. Assuming for the sake of argument that the entire amount represented proceeds from sale of the collateral, if that amount were applied to reduce the debt of $462,295.47, the balance to be treated as an unsecured claim for purposes of § 109(e) would be $424,552.88. The collateral would have to be worth $171,771.48 in order to reduce the Bank's claim to one cent less than $290,525 and meet the unsecured debt limit of § 109(e),[8] which is not remotely supported by the evidence—the Debtor testified that MSRI had minimal equipment when she acquired it and spent only $27,000 to buy more, all of which was liquidated for something less than $38,000 nine months post-petition.

Accordingly, the Debtor owed noncontingent and liquidated unsecured debt on the date of bankruptcy totaling more than $290,525, and is therefore ineligible for relief under Chapter 13.

### CONCLUSION

For the reasons set forth above, the Bank's objection to confirmation of the Debtor's Plan is sustained to the extent that it alleges ineligibility, and is moot with respect to all other grounds raised.

Counsel for the Bank shall submit a form of order so providing, after review by counsel for the Debtor as to form.

---

8. The Debtor's amended schedules list other unsecured claims totaling $42,815.25, which would have to be included in the eligibility calculation unless they were contingent and/or unliquidated.